FILED

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF TEXAS

3   MARSHALL DIVISION

4   TIVO, INC                    .   DOCKET NO. 2:04CV01

5   VS.                          .   TEXARKANA, TEXAS

6   ECHOSTAR COMM, ET AL         .   JANUARY 31, 2006, 9:58 A.M.

7   SUMMARY JUDGMENT MOTIONS

8   BEFORE THE HONORABLE DAVID FOLSOM

9   UNITED STATES DISTRICT JUDGE.

10  APPEARANCES:

11  FOR PLAINTIFF:                    MR. PERRY M. GOLDBERG
                                      MR. MORGAN CHU
12                                    MS. CHRISTINE W S BYRD
                                      MR. ANDREI IANCU
13                                    MR. ALEXANDER C D GIZA
                                      IRELL & MANELLA LLP
14                                    1800 AVENUE OF THE STARS
                                      SUITE 900
15                                    LOS ANGELES, CA 90067

16                                    MR. GARRET W. CHAMBERS
                                      MCKOOL SMITH - DALLAS
17                                    300 CRESCENT COURT
                                      SUITE 1500
18                                    DALLAS, TEXAS 75201

19  FOR DEFENDANT:                    MR. DAMON M. YOUNG
                                      MR. JOHN PICKETT
20                                    YOUNG, PICKETT & LEE
                                      4122 TEXAS BOULEVARD
21                                    TEXARKANA, TEXAS 75504

22                                    MS. RACHEL KREVANS
                                      MORRISON & FOERSTER
23                                    425 MARKET STREET
                                      SAN FRANCISCO, CA 94105

24
                                      MR. KARL J. KRAMER
25                                    MORRISON & FOERSTER

```
 1                                    755 PAGE MILL ROAD
                                      PALO ALTO, CA 94304
 2

 3

 4   COURT REPORTER:                  MS. LIBBY CRAWFORD
                                      OFFICIAL COURT REPORTER
 5                                    500 STATE LINE AVENUE
                                      TEXARKANA, TEXAS 75501
 6                                    903/794-4067 (EXT. 237)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   PROCEEDINGS RECORDED BY MANUAL STENOGRAPHY, TRANSCRIPT

25   PRODUCED BY NOTE READING.
```

1                                    INDEX

2   THE COURT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3   MR. IANCU. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4   MS. KREVANS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

5   MR. IANCU. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

6   MS. KREVANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

7   MR. IANCU. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

8   MS. KREVANS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

9   MR. IANCU. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59

10  MS. KREVANS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63

11  MR. KRAMER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

12  MR. GOLDBERG. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .70

13  MR. CHU. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75

14  MR. KRAMER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .76

15  MR. CHU. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .76

16  REPORTER'S CERTIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . .80

17

18

19

20

21

22

23

24

25

1   P R O C E E D I N G S

2   TEXARKANA, TEXAS

3   JANUARY 31, 2006

4   (OPEN COURT)

5   THE COURT: MRS. MARTIN, IF YOU WILL CALL THE OTHER

6   MATTER SCHEDULED FOR THE TEN O'CLOCK HOUR.

7   THE CLERK: THE COURT CALLS CIVIL ACTION NUMBER

8   2:04CV1, TIVO V. ECHOSTAR.

9   THE COURT: GOOD MORNING, LADIES AND GENTLEMEN. WE

10  ARE HERE ON VARIOUS COMPETING MOTIONS FOR SUMMARY JUDGMENT IN

11  THE MORNING HOUR. I BELIEVE I HAVE GIVEN EACH SIDE ONE HOUR

12  TO PRESENT MOTIONS AND RESPONSES, THEN JUDGE CRAVEN WILL HAVE

13  AN AFTERNOON SESSION CONCERNING DEPOSITION OBJECTIONS AND

14  EXHIBIT OBJECTIONS.

15  MY SUGGESTION, TIVO HAS ONE OUTSTANDING MOTION FOR

16  PARTIAL SUMMARY JUDGMENT. I WOULD SUGGEST TIVO GO FORWARD

17  WITH THAT MOTION, AND THEN ECHOSTAR MAY GO FORWARD IN ANY

18  PARTICULAR MOTION OR ORDER THAT YOU DESIRE. IS THAT AGREEABLE

19  WITH THE PARTIES?

20  MR. CHU: YES, YOUR HONOR.

21  THE COURT: WHAT I WOULD LIKE TO DO IS HAVE MOTION,

22  RESPONSE, REPLY BEFORE WE MOVE TO THE NEXT MOTION. AND AT THE

23  END OF THE DAY, IT WOULD PROBABLY BE HELPFUL IF THE PARTIES

24  WOULD ORDER A COPY OF THE TRANSCRIPT FROM MRS. CRAWFORD. AND

25  THEN BEFORE YOU LEAVE, I WANT TO DISCUSS EVERYONE'S CALENDAR

1  FOR THE MONTH OF MARCH. SO DON'T LET ME FORGET THAT.  OR IF

2  YOU LIKE, WE CAN DISCUSS THAT NOW.  WHAT IS EVERYONE'S

3  CALENDAR LOOKING LIKE FOR MARCH?  WHAT SAYS THE PLAINTIFF?

4           MR. CHU: MORGAN CHU ON BEHALF OF PLAINTIFF TIVO,

5  YOUR HONOR.  AS I THINK I INDICATED AT THE LAST HEARING, I

6  HAVE ANOTHER COURT THAT HAD SET A TRIAL FOR FEBRUARY 28TH.  MY

7  EXPECTATION IS THAT IT WILL PROBABLY BE DONE, ASSUMING IT GOES

8  FORWARD, IN ABOUT TWO WEEKS.  LOOKING AT THE CALENDAR AND

9  ALLOWING SOME ALLOWANCE, I THINK THAT IF WE WERE TO SET THE

10  CASE MARCH 20TH OR LATER.  AT THE PRIOR HEARING, YOUR HONOR

11  SAID THAT YOU WERE AT LEAST TENTATIVELY CONSIDERING SETTING

12  THE CASE EITHER FOR MARCH 14TH OR MARCH 27TH.  SO IF IT IS

13  BETWEEN THOSE TWO DATES, WE HAD INDICATED --

14           THE COURT: THE ONLY PROBLEM WITH IF WE START IT

15  MARCH THE 27TH, I HAVE THE COURTROOM FOR ESSENTIALLY THE MONTH

16  OF, THE BIG COURTROOM, THE MONTH OF MARCH.  IF WE START IT THE

17  27TH, THEN OBVIOUSLY WE ARE GOING TO RUN INTO APRIL ON THIS

18  CASE.  BUT I ALSO HAVE A CASE, SKY TECHNOLOGY V. IBM, THAT I

19  ALSO WANT TO TRY TO SET.  SO I WILL DO MY LEVEL BEST TO WORK

20  AROUND EVERYONE'S SCHEDULE.  WHEN WILL YOU KNOW MORE ABOUT

21  YOUR FEBRUARY 28TH SETTING?

22           MR. CHU: THERE ISN'T A DATE CERTAIN.

23           THE COURT: WHEN WAS THAT CASE SET, DO YOU KNOW?

24           MR. CHU: I THINK THE CURRENT DATE WAS SET SOMETIME

25  IN THE FALL OF 2005.  IT MIGHT HAVE BEEN LATE FALL.

1        THE COURT: BEFORE OR AFTER THIS ONE WAS SET, DO YOU

2  KNOW?

3        MR. CHU: EXCUSE ME?

4        THE COURT: BEFORE OR AFTER THIS CASE WAS SET, DO YOU

5  KNOW?

6        MR. CHU: I DON'T RECALL TO A CERTAINTY, YOUR HONOR.

7  I HAVE A BELIEF, BUT BECAUSE I AM UNCERTAIN I DON'T WANT TO

8  GUESS AT IT.

9        THE COURT: WHY DON'T YOU TRY TO LET US KNOW IN THAT

10  REGARD.   WHERE IS THAT CASE SET?

11        MR. CHU: LOS ANGELES, YOUR HONOR.

12        THE COURT: FEDERAL OR STATE COURT?

13        MR. CHU: FEDERAL COURT.

14        THE COURT: BEFORE, WHO IS THE JUDGE?

15        MR. CHU: JUDGE RAFEEDIE, AND HAVING TRIED A CASE

16  BEFORE HIM BEFORE, I KNOW THAT HE WILL BE VERY SPEEDY IN TERMS

17  OF THE LENGTH OF TRIAL, ASSUMING IT DOES TAKE PLACE BECAUSE -

18        THE COURT: I AM JUST TRYING TO DETERMINE WHO HAS

19  PRIORITY ON YOUR CALENDAR.

20        MR. CHU: EXCUSE ME, YOUR HONOR?

21        THE COURT: I WAS JUST TRYING TO DETERMINE WHO MIGHT

22  HAVE PRIORITY ON YOUR CALENDAR, THIS COURT OR THE CALIFORNIA

23  COURT.   SO THAT'S WHY I ASK WHEN YOUR CASE WAS SET.

24        MR. CHU: RIGHT.  IF YOU ARE ASKING ABOUT MY

25  CALENDAR, IF I AM MAKING A DECISION, WHICH I DON'T ALWAYS HAVE

1   THAT OPPORTUNITY TO DO, THIS CASE DEFINITELY HAS PRIORITY.   AS

2   YOUR HONOR KNOWS, WE WERE SET TO GO IN OCTOBER AND BECAUSE OF

3   THE CONFLICTS THAT WERE UNAVOIDABLE, NOW WE ARE SET TO GO IN

4   MARCH.

5           THE COURT: OKAY. WHAT SAYS ECHOSTAR?

6           MS. KREVANS: YOUR HONOR, ECHOSTAR IS AVAILABLE, MR.

7   MCELHINNY, MR. KRAMER AND I, ON EITHER SET OF THE TWO WEEK

8   DATES.   WE ARE ALSO ASSUMING THAT JURY SELECTION IS STILL SET

9   FOR MARCH 7.

10          THE COURT: WELL, IT DEPENDS UPON IF I TRY THIS CASE

11  LATER IN MARCH, I MAY NOT SELECT THE JURY UNTIL THE DAY WE

12  START TRIAL, AND SELECT THE JURY AND HAVE OPENING STATEMENTS

13  AND START TESTIMONY THE NEXT DAY.   SO, I HOPE TO KNOW MORE

14  ABOUT MY, THOSE SETTINGS, WITHIN THE NEXT WEEK OR SO, BECAUSE

15  I KNOW EVERYONE HAS ARRANGEMENTS TO MAKE CONCERNING EXPERTS.

16  AND I WOULD LIKE A REPORT ON YOUR CALIFORNIA CASE, IF YOU CAN

17  GIVE ME MORE INFORMATION BY THE CLOSE OF THE WEEK OR EARLY

18  NEXT WEEK.

19          MS. KREVANS: YOUR HONOR, THE ONE THING I WOULD SAY,

20  ALTHOUGH IT IS NOT EASY, THE LAWYERS CAN DEFINITELY HOLD THEIR

21  CALENDARS.   WE DO HAVE A NUMBER OF WITNESSES –

22          THE COURT: I UNDERSTAND.

23          MS. KREVANS: –– WHO ARE HAVING PROBLEMS WITH TRYING

24  TO HOLD FIVE WEEKS, AND THE SOONER WE KNOW THE BETTER.

25          THE COURT: I UNDERSTAND.   I AM GOING TO TRY TO LET

1  BOTH THE LAWYERS KNOW IN THIS CASE AND THE IBM CASE SOON.  MY

2  PLANS RIGHT NOW ARE SET THEM BOTH AND TRY THEM BOTH.  SO, IT

3  IS GOING TO BE A LOVELY MARCH.

4      WITH THOSE COMMENTS, LET'S GO FORWARD WITH THE MOTION FOR

5  SUMMARY JUDGMENT.

6          MR. CHU: THANK YOU, YOUR HONOR.

7          THE COURT: WE WILL PROBABLY TRY TO TAKE A RECESS IN

8  APPROXIMATELY AN HOUR, GIVE OR TAKE A FEW MINUTES.

9          MR. IANCU: GOOD MORNING, YOUR HONOR.  MY NAME IS

10  ANDREI IANCU FROM IRELL & MANELLA.  WITH ME TODAY, IN ADDITION

11  TO MR. CHU, IS PERRY GOLDBERG, ALEX GIZA, ALSO FROM IRELL &

12  MANELLA, AND GARRET CHAMBERS FROM MCKOOL SMITH.  MATTHEW ZINN,

13  GENERAL COUNSEL OF TIVO, IS ALSO IN THE AUDIENCE.

14      BEFORE WE BEGIN, I WOULD LIKE TO HAND OUT OUR BOOKLET OF

15  SLIDES.  MAY I APPROACH?

16          THE COURT: YES.

17          MR. IANCU: I WILL NOT BE USING ALL THE SLIDES.  I

18  WILL BE REFERRING TO THEM, TO JUST A FEW OF THEM AS I GO

19  ALONG.  IN THE INTEREST OF TIME, WE WILL TOUCH ONLY ON SOME OF

20  THE ISSUES PRESENTED IN OUR PAPERS.

21      BEFORE WE -- SO I AM GOING TO ADDRESS FIRST TIVO'S MOTION

22  FOR SUMMARY JUDGMENT REGARDING CLAIMS 1 AND 32.  AND BEFORE I

23  BEGIN, I WANT TO PROVIDE THE COURT WITH A BRIEF AND QUICK

24  REVIEW OF THE PATENTED TECHNOLOGY.  AS WE MENTIONED BEFORE

25  WHEN WE WERE HERE FOR THE MARKMAN HEARING, THIS CASE AND THE

1   PATENTED TECHNOLOGY DEALS WITH AN IMPROVED ECONOMICAL AND

2   EFFICIENT WAY TO ACHIEVE DIGITAL VIDEO RECORDING TECHNOLOGY,

3   OR WHAT IS KNOWN AS DVRS.  THE IDEA IS TO RECORD LIVE

4   TELEVISION AND SIMULTANEOUSLY BE ABLE TO PLAY IT BACK.

5       LET'S USE FIGURE 1 FROM THE PATENT AS A TALKING EXAMPLE,

6   AND LOOK INSIDE AN EXAMPLE OF WHAT MIGHT BE A DIGITAL VIDEO

7   RECORDER PURSUANT TO TIVO'S PATENT.  THERE ARE WHAT WE HAVE

8   TALKED ABOUT AS TWO INDEPENDENT PROCESSES, ONE FOR RECORDING

9   LIVE TELEVISION, AND THE SECOND FOR PLAYING BACK LIVE

10  TELEVISION.  THESE TWO PROCESSES ARE INDEPENDENT OF EACH

11  OTHER, THOUGH OBVIOUSLY INTERCONNECTED AND INTERRELATED.

12      STEPPING THROUGH THE FIGURE, JUST AS AN EXAMPLE, TO GET

13  OUR BEARINGS IN TERMS OF WHAT THE PATENT IS ABOUT, WE ARE

14  LOOKING INSIDE OF THE DIGITAL VIDEO RECORDER.  THIS IS, AS AN

15  EXAMPLE, FIGURE 1 FROM THE PATENT.  WE START WITH INPUT

16  TELEVISION STREAMS.

17      TELEVISION COMES TO OUR HOMES IN A VARIETY OF WAYS.  YOU

18  KNOW, IT COULD BE AN ANTENNA ON OUR HOUSE OR RABBIT EARS.  IN

19  THIS PARTICULAR CASE, WE HAVE SATELLITE TRANSMISSION FROM A

20  SATELLITE UP IN SPACE.  THE WAVES TRAVEL THROUGH THE AIR IN AN

21  ANALOG FORMAT.  THEY REACH THE DVR THAT IS CONNECTED TO OUR

22  TV.  THESE ARE THE INPUT STREAMS.

23      FIRST, THE INPUT MODULE INSIDE THE DVR TAKES THE INPUT

24  STREAMS, WHICH ARE IN AN ANALOG FORMAT, AND CONVERTS THEM INTO

25  A STANDARDIZED DIGITAL FORMAT SO THAT THE COMPUTER INSIDE OF

1   THE DVR CAN PROCESS IT AND CAN PROCESS THE SIGNALS.

2        THE OUTPUT OF THE INPUT MODULE IS -- ARE WHAT'S CALLED

3   MPEG STREAMS.  THESE ARE DIGITAL STREAMS STANDARDIZED.  THE

4   WORD MPEG, OR THE INITIALS M-P-E-G, SIMPLY STAND FOR A

5   STANDARD FOR DIGITAL VIDEO PROCESSING.

6        THE STANDARDIZED SIGNALS THEN GO TO WHAT IS CALLED IN THE

7   PATENT A MEDIA SWITCH, WHICH ANALYZES AND INTELLIGENTLY

8   PROCESSES THE DATA.  THEN THE DATA IS STORED ON THE HARD

9   DRIVE.  THIS IS ON THE INPUT SIDE OF THE PROCESS.  NOW, YOU

10  HAVE A PROGRAM THAT YOU DIDN'T WATCH -- I'M SORRY.  NOW YOU

11  HAVE A PROGRAM THAT YOU WANTED TO STORE, YOU HAVE IT STORED ON

12  THE HARD DISK.

13       ON THE OUTPUT SIDE, WHEN YOU WANT TO WATCH WHAT YOU HAVE

14  STORED, THE DATA COMES OUT OF THE HARD DISK -- I'M SORRY.  THE

15  DATA COMES OUT OF THE HARD DISK.  IT GETS REASSEMBLED AS A

16  STREAM OF DIGITAL DATA.  IT GOES THROUGH AN OUTPUT MODULE AND

17  CONVERTED BACK TO ANALOG SIGNALS FOR OUR TV TO DISPLAY THEM

18  AND WE CAN WATCH THEM.

19       ALL RIGHT, SO LET'S TURN NOW TO THE CLAIM, CLAIM 1 AS AN

20  EXAMPLE.  WE ALSO HAVE A BOARD BENEATH THE SCREEN.  I AM NOT

21  SURE THAT IT IS VISIBLE FROM THAT DISTANCE.  IN ANY EVENT,

22  THERE ARE TERMS THAT THE PARTIES ARE DISPUTING IN

23  HIGHLIGHTING.  I WILL NOT ADDRESS ALL OF THEM.  I WILL FOCUS,

24  IN THE INTEREST OF TIME, ON WHAT SEEMS TO BE THE CORE DISPUTE

25  BETWEEN THE PARTIES.

1    AND LET'S START WITH ELEMENT 1D WHICH DEALS WITH THE

2    CONVERSION.  WE GO BACK AND LOOK AT THE FIGURE.  THIS HAPPENS

3    IN THE INPUT MODULE UP IN THE UPPER LEFT WHERE THE DIGITAL,

4    I'M SORRY, THE ANALOG DATA FROM THE SATELLITE GETS CONVERTED

5    INTO WHAT IS CALLED MPEG STREAMS, A STANDARDIZED FORMAT.

6        THE COURT HAS CONSTRUED THIS TERM, OR THIS ELEMENT 1D,

7    AND WE SHOW ON THE SCREEN THE COURT'S CONSTRUCTION.  THE KEY

8    TO ELEMENT 1D, AND I AM GOING TO WALK OVER TO THE BOARD HERE,

9    IS THAT WHAT IS GETTING CONVERTED ARE ANALOG STREAM, I'M

10   SORRY, ANALOG DATA FROM THE SATELLITE INTO DIGITAL STREAMS.

11   THEY ARE CONVERTED INTO MPEG FORMATTED STREAMS FOR INTERNAL

12   TRANSFER AND MANIPULATION.

13        THE COURT: IT SEEMS ECHOSTAR'S PRIMARY DEFENSE TO

14   THIS MOTION IS THAT THE CONVERSION IN THE ECHOSTAR TECHNOLOGY

15   TAKES PLACE AT WHAT THEY CALL UP LINK CENTERS.  DO YOU AGREE

16   WITH THAT?  IN OTHER WORDS, THE MPEG CONVERSION DOESN'T TAKE

17   PLACE IN THE ECHOSTAR ACCUSED PRODUCT.

18        MR. IANCU.  RIGHT.  THIS IS ONE OF THEIR KEY

19   DEFENSES TO THIS MOTION, NO QUESTION ABOUT THAT.  AND I WILL

20   ADDRESS THAT RIGHT NOW.

21        WHAT THEY ARE SAYING IS THAT THE SATELLITE TRANSMITS

22   ALREADY FORMATTED MPEG STREAMS, BUT THAT IS SIMPLY NOT THE

23   FACT.  WHAT COMES THROUGH THE AIR WAVES ARE ANALOG SIGNALS.

24   ANALOG, AND THIS IS NOT A MATTER IN DISPUTE, ECHOSTAR ADMITS

25   THAT WHAT TRAVELS THROUGH THE AIR SPACE ARE ANALOG WAVES.  YOU

1   CANNOT HAVE DIGITAL WAVES TRAVELING THROUGH OUR AIR.   IT IS

2   JUST ZEROS AND ONES.

3        TO HAVE AN MPEG FORMATTED STREAM, YOU MUST CONVERT IT

4   FROM ANALOG TO DIGITAL.   IN FACT, THE STANDARD SPECIFICATION

5   FOR MPEG STATES, DEFINES THE WORD STREAM, WHICH APPEARS IN THE

6   CLAIM.   AND IT STATES THAT THE STREAM IS, QUOTE, "AN ORDERED

7   SERIES OF BITS THAT FORM THE CODED REPRESENTATION OF THE

8   DATA," CLOSE QUOTE.   THAT IS FROM THE MPEG 2 VIDEO STANDARD.

9        WHEN IT TALKS ABOUT BITS, BITS IS SHORT FOR BINARY DIGITS

10  OR DIGITAL DATA.   SO THE CLAIM REQUIRES CONVERSION INTO AN

11  MPEG STREAM DIGITAL DATA.   AND ECHOSTAR DOES THAT.   IT DOES

12  CONVERT IN THE DVR FROM ANALOG INTO DIGITAL.

13       NOW, WE CAN SEE THE CONVERSION TAKING PLACE IN ECHOSTAR'S

14  SYSTEM.   THIS IS NOT THE MATTER IN DISPUTE.   THERE IS ANALOG

15  TO DIGITAL CONVERSION.   THERE ARE A NUMBER OF OTHER

16  CONVERSIONS AS WELL, SUCH AS DEMODULATION, FORWARD ERROR

17  CORRECTION, AND DESCRAMBLING AND RESCRAMBLING.

18       THE POINT, HOWEVER, IS THAT ECHOSTAR ADMITS THAT IT

19  CONVERTS THE DATA FROM ANALOG TO DIGITAL.   THIS IS NOT THE

20  POINT IN DISPUTE.   IT IS NOT A QUESTION OF FACT.

21            THE COURT: HOW DO THEY ADMIT THAT?   IN WHAT METHOD,

22  BY TESTIMONY OR REQUEST FOR ADMISSIONS?

23            MR. IANCU: THERE IS TESTIMONY FROM THEIR EXPERT, AND

24  IN THEIR BRIEF ECHOSTAR STATES THAT ECHOSTAR ADMITS, I'M

25  SORRY, THAT ECHOSTAR CONVERTS FROM ANALOG TO DIGITAL.   THERE

1    IS NO QUESTION THAT THEY CONVERT FROM ANALOG TO DIGITAL.

2    THEIR ONLY POINT OF DISPUTE IS THAT THAT'S NOT THE CONVERSION

3    INTO DIGITAL, INTO AN MPEG STREAM.  SO THEY ARE ADMITTING THAT

4    THEY HAVE ANALOG TO DIGITAL CONVERSION BY THEIR DISPUTING

5    WHETHER THAT IS A CONVERSION INTO AN MPEG STREAM BECAUSE, THEY

6    ARGUE, IT IS ALREADY FORMATTED AS AN MPEG STREAM.  BUT THAT IS

7    NOT THE CASE.  SIGNALS TRAVEL FROM THE SATELLITE IN AN ANALOG

8    FORMAT.  THAT IS NOT AN MPEG STREAM.  TO BE AN MPEG STREAM, IT

9    MUST GO THROUGH ANALOG TO DIGITAL CONVERSION.

10       AND WITH THAT, I AM GOING TO MOVE ON TO A DIFFERENT CLAIM

11   ELEMENT, UNLESS THE COURT HAS FURTHER QUESTIONS.

12            THE COURT: NO, YOU MAY GO FORWARD.  I'M SORRY.

13            MR. IANCU: THE SECOND POINT OF DISPUTE BETWEEN THE

14   PARTIES, OF MAJOR DISPUTE THAT SEEMS TO FORM THE CRUX OF

15   ECHOSTAR'S DEFENSE TO THIS MOTION, IS ELEMENT 1E, WHICH

16   PROVIDES A MEDIA SWITCH WHERE THE MEDIA SWITCH, I'M SORRY,

17   ANALYZES THE MPEG STREAM AND SEPARATES IT INTO VIDEO AND AUDIO

18   COMPONENTS.

19       LET'S TAKE A QUICK LOOK BACK AT THE FIGURE AND SEE WHERE

20   THIS IS HAPPENING.  THIS IS THE MEDIA SWITCH THAT APPEARS IN

21   THE MIDDLE OF THE FIGURES.  THIS IS SLIDE 4.  THE DATA COMES

22   IN FROM THE INPUT MODULE.  IT HAS BEEN CONVERTED TO THE

23   STANDARDIZED MPEG STREAM DIGITAL DATA.  THEN THE MEDIA SWITCH

24   BEFORE IT STORES IT ONTO THE HARD DISK, IT PROCESSES IT AND IT

25   ANALYZES IT, AND IT, AS THE CLAIM SAYS, SEPARATES IT INTO

1   AUDIO AND VIDEO COMPONENTS, OR DISTINGUISHES THE COMPONENTS

2   FROM EACH OTHER.  DOES ECHOSTAR DO THAT?  WELL, ECHOSTAR, OF

3   COURSE, HAS A MEDIA SWITCH.  IT HAS A COMPUTER CHIP THAT HAS

4   WHAT WE KNOW AS A MEDIA SWITCH.  IT HAS A CPU.  IT MEDIATES

5   BETWEEN THE HARD DISK MEMORY AND THE CPU.

6       LET'S FOCUS, THOUGH, ON THE WORD SEPARATE AND ANALYZE, OR

7   PARSE, AS THE COURT HAS CONSTRUED THAT TERM.  WHAT REALLY DOES

8   THE PATENT TALK ABOUT?  WHEN THE PATENT TALKS ABOUT THE

9   PARSER, OR THIS COMPONENT WITHIN THE MEDIA SWITCH, IT TALKS

10  ABOUT SOMETHING THAT ANALYZES THE DATA THAT HAS BEEN CONVERTED

11  INTO DIGITAL DATA.  IT LOOKS FOR IMPORTANT EVENTS.  IT

12  IDENTIFIES VIDEO AND AUDIO SEGMENTS, AND IT CREATES WHAT IS

13  KNOWN AS A FRAME INDEX, OR AN EVENT CUE.  IT LOOKS FOR AUDIO

14  AND VIDEO DATA, TRIES TO FIGURE OUT WHICH IS WHICH, WHERE IT

15  HAS OCCURRED, AND KEEPS TRACK OF IT.

16      AN MPEG STREAM, GOING BACK TO THE STANDARDIZED DIGITAL

17  STREAM, IS A STREAM OF VIDEO AND AUDIO COMPONENTS.  BY

18  DEFINITION, THEY HAVE BEEN SEPARATED.  THEY HAVE BEEN AS PART

19  OF THE CONVERSION PROCESS TURNED INTO VIDEO, SEPARATE VIDEO

20  AND AUDIO COMPONENTS.  ECHOSTAR USES MPEG, AND THERE IS NO

21  QUESTION THAT THEY HAVE STREAMS WITH COMPONENTS THAT ARE

22  SEPARATED IN THIS MANNER.

23      WHAT IS NEEDED FOR THE DVR, THOUGH, TO BE AN INTELLIGENT

24  SYSTEM AND PROCESS THE DATA EFFICIENTLY IS TO IDENTIFY AND TO

25  DISTINGUISH THE VIDEO AND THE AUDIO SEGMENTS OR COMPONENTS TO

1   KEEP TRACK OF THEM.   THIS IS WHAT IS KNOWN AS THE SEPARATION

2   OF THE COMPONENTS.   IT IS A DISTINGUISHMENT OF THE COMPONENTS.

3   WHEN WE TALK ABOUT THE WORD SEPARATE, WE THINK ABOUT

4   DISTINGUISHING.

5       WHEN WE WERE HERE LAST TIME, YOUR HONOR, WE SPOKE ABOUT A

6   LAW SCHOOL CLASS EXAMPLE, AND WE SAID WE DON'T KNOW IF

7   EVERYBODY AGREES WITH THIS, BUT ONE CAN CONTEMPLATE LAW SCHOOL

8   GRADES ON AN EXAM, PERHAPS SEPARATING THE STUDENTS THAT HAVE

9   MASTERED THE MATERIAL FROM THE STUDENTS THAT HAVE NOT MASTERED

10  THE MATERIAL.   NOT EVERYBODY AGREES WITH THIS ANALYSIS OF LAW

11  SCHOOL, OF COURSE, BUT IN ANY EVENT, IT IS A LOGICAL

12  IDENTIFICATION OF STUDENTS WHO HAVE, FOR EXAMPLE, A'S, VERSUS

13  STUDENTS WHO HAVE B'S.   NO PHYSICAL SEPARATION IS NECESSARY.

14  YOU DON'T NEED TO SEND THE A'S TO ONE ROOM AND THE B'S TO A

15  SEPARATE ROOM.   AS LONG AS YOU HAVE TABBED THEM AND KEEPING

16  TRACK OF THEM, YOU KNOW WHICH IS WHICH.

17      NOW, WHY IS IT NECESSARY TO IDENTIFY AND DISTINGUISH THE

18  VIDEO AND AUDIO COMPONENTS?   LET'S LOOK AT THE DVR SYSTEM

19  AGAIN IN ITS ENTIRETY.   DATA COMES IN, AS I SAID, BROADCASTS

20  TV SIGNALS IN AN ANALOG FORMAT.   THE INPUT SECTION THEN

21  CONVERTS THEM INTO DIGITAL STANDARDIZED FORMATS.   IT GETS NOW

22  TO THE MEDIA SWITCH, THE COMPONENT WE ARE TALKING ABOUT.   WHAT

23  DOES THE MEDIA SWITCH DO?   IT ANALYZES THEM AND THEN IT

24  SEPARATES THEM.   IT CREATES THIS TABLE OF VIDEO AND AUDIO

25  COMPONENTS WHERE THEY HAVE OCCURRED, WHERE THEY ARE IN MEMORY,

1   AND HOW TO KEEP TRACK OF THEM.

2      THIS IS NECESSARY SO THAT WHEN YOU COME BACK HOME, FOR

3   EXAMPLE, AND YOU WANT TO WATCH THE TV PROGRAM THAT YOU HAVE

4   STORED, YOU CAN QUICKLY FIND IT AND TAKE IT OUT OF THE HARD

5   DRIVE AND OUTPUT IT TO YOUR TV.

6      NOW, DOES ECHOSTAR HAVE SUCH A SYSTEM?  INDEED IT DOES.

7   ECHOSTAR HAS WHAT IS LABELED IN THEIR DOCUMENTS AS A START

8   CODE DETECTOR.  THE START CODE DETECTOR HAS THE DIGITAL DATA

9   GOING THROUGH IT, AND IT ANALYZES IT AND THEN IT SEPARATES IT

10  JUST AS THE PATENT DESCRIBES.  AS YOU CAN SEE ON THE SLIDE,

11  THE DATA GOES THROUGH, AND WHEN IT ENCOUNTERS A VIDEO FRAME,

12  IT KEEPS TRACK OF WHERE THE VIDEO FRAME HAS OCCURRED AND WHERE

13  IN MEMORY IT HAS PLACED IT.  THIS WAY THE VIDEO DATA, IT IS

14  SEPARATED.  IT IS SEPARATED FROM THE AUDIO DATA.

15     DIFFERENT ECHOSTAR PRODUCTS OPERATE A LITTLE DIFFERENTLY.

16  IN OTHER ECHOSTAR PRODUCTS, THE DATA ACTUALLY GETS PHYSICALLY

17  SEPARATED INTO TWO STREAMS, A VIDEO STREAM AND AN AUDIO

18  STREAM.  THIS ALSO, OF COURSE, INFRINGES THE PATENT.  BUT THE

19  KEY POINT, AND ECHOSTAR ADMITS THAT THIS EMBODIMENT IN THEIR

20  PRODUCTS, THEY ARE CALLED THE ECHOSTAR DP-50X PRODUCTS, MEET

21  THIS CLAIM ELEMENT.  THERE IS AN ADMISSION TO THAT EFFECT.

22  BUT THEY SAY THAT THIS IS THE ONLY PRODUCT THAT MEETS THIS

23  CLAIM ELEMENT, BECAUSE IN THIS PRODUCT THERE IS CLEAR PHYSICAL

24  SEPARATION BETWEEN THE VIDEO AND AUDIO STREAMS.

25     BUT THE CLAIMS DO NOT REQUIRE PHYSICAL SEPARATION, AND IN

1  ANY EVENT, THE CLAIMS DO NOT REQUIRE PHYSICAL SEPARATION INTO

2  TWO SEPARATE STREAMS.  THE CLAIMS SIMPLY SAY THAT IT MUST

3  SEPARATE VIDEO AND AUDIO COMPONENTS.  AND THE WORD COMPONENT

4  IS NOT THE SAME AS THE WORD STREAM.  IN THE DP-50X THAT WE SEE

5  IN THIS FIGURE, CLEARLY TWO SEPARATE STREAMS HAVE BEEN

6  CREATED.  IN THEIR OTHER, IN THE OTHER ECHOSTAR PRODUCTS, THE

7  COMPONENTS ARE SEPARATED, JUST LIKE THE CLAIM REQUIRES.  AND A

8  TABLE OF THE VIDEO DATA IS EXTRACTED SEPARATE FROM THE AUDIO

9  DATA.

10  THESE ARE THE ONLY TWO ELEMENTS, YOUR HONOR, THAT I WANT

11  TO COVER, IN THE INTEREST OF TIME.  UNLESS THE COURT HAS OTHER

12  QUESTIONS, THE REST OF THE ELEMENTS ARE BRIEFED IN OUR PAPERS.

13  THE COURT: NOT AT THIS TIME.  RESPONSE.

14  MS. KREVANS: GOOD MORNING, YOUR HONOR.  RACHEL

15  KREVANS FROM MORRISON FOR ECHOSTAR.  ALSO WITH ME TODAY ARE

16  KARL KRAMER, DAMON YOUNG, JOHN PICKETT, AND OUR CLIENT, KERRY

17  MILLER, IS HERE AS WELL.  WHY DON'T WE GO AHEAD AND GO TO A

18  COUPLE OF PAGES IN, KARL.

19  LET ME FIRST, BEFORE I GET INTO THE SPECIFICS OF OUR

20  PRESENTATION, ADDRESS A COUPLE OF THE OVERALL POINTS THAT MR.

21  IANCU JUST MADE.  FIRST OF ALL, HE STARTED OUT WITH WHAT HE

22  CALLED A DESCRIPTION OF THE TECHNOLOGY OF THE '389 PATENT.

23  AND HE SAID IT WAS THIS IMPROVED DVR THAT HAD BETTER ECONOMY,

24  AND EFFICIENT PROCESSING, AND SOME OTHER THINGS.

25  WHAT HE DIDN'T MENTION IS THAT ONE OF THE FEATURES OF THE

1  '389 PATENT IS THAT IT IS A BOX THAT IS SUPPOSED TO BE ABLE TO

2  PROVIDE A UNIVERSAL DIGITAL VIDEO RECORDER TO A CUSTOMER SO

3  THAT NO MATTER WHAT KIND OF TV SYSTEM THE CUSTOMER HAS, THEY

4  CAN STILL RECORD DIGITALLY AND STORE IT ON A HARD DRIVE AND

5  PLAY IT BACK, INCLUDING, FOR EXAMPLE, WITH ALL OFF AIR

6  TELEVISION, WHICH IS AN ANALOG TELEVISION FORMAT.  AND IN

7  ORDER TO DO THAT, IN ORDER TO BE A UNIVERSAL DVR, TO ACCEPT

8  ALL THESE DIFFERENT FORMATS, THE BOX HAS TO HAVE INSIDE IT AN

9  MPEG CONVERTOR.

10      WHY DOES IT HAVE TO HAVE THAT?  BECAUSE YOU CAN'T STORE

11  ANALOG TELEVISION ON A HARD DRIVE AND EXPECT TO STORE MORE

12  THAN A HALF HOUR OR AN HOUR SHOW ON YOUR WHOLE BOX.  IT'S TOO

13  BIG.  YOU HAVE TO DIGITIZE AND COMPRESS THE INFORMATION.

14  THAT'S THE POINT OF THE MPEG CONVERSION.  AND THIS BOX AND

15  THIS SYSTEM WAS DESIGNED SO THAT NO MATTER WHAT KIND OF TV YOU

16  GOT, YOU COULD, IF NECESSARY, WHICH WAS ONLY TRUE FOR ANALOG

17  FORMAT BROADCASTS, YOU COULD CONVERT IT TO MPEG, MEANING YOU

18  COMPRESS IT, AND NOW INSTEAD OF HAVING A HARD DRIVE THAT CAN

19  ONLY STORE AN HOUR OF TELEVISION, YOU HAVE GOT A HARD DRIVE

20  THAT CAN STORE TWENTY OR THIRTY OR FORTY, IN MODERN BOXES, A

21  HUNDRED HOURS.  THAT IS A KEY ASPECT OF THIS INVENTION, IT IS

22  A KEY ASPECT OF THE DISCLOSURE, AND IT IS A KEY ASPECT OF

23  THESE CLAIMS.  AND MR. IANCU WOULD LIKE YOU NOT TO THINK ABOUT

24  THAT BECAUSE, OF COURSE, ECHOSTAR BOXES DON'T DO THAT.

25      NOW, THE OTHER BIG PICTURE POINT THAT MR. IANCU STARTED

1   WITH WAS THIS NOTION OF ECHOSTAR'S BROADCAST BEING BROADCAST

2   IN ANALOG FORMAT.  HE IS MIXING AND MATCHING TWO ASPECTS OF

3   TECHNOLOGY HERE, AND I HAVE GOT SOME SLIDES THAT ARE GOING TO

4   ILLUSTRATE THIS LATER ON, BUT I WANTED TO FLAG THIS POINT AT

5   THE BEGINNING, BECAUSE IT IS REALLY IMPORTANT.

6       WHEN MR. IANCU SAID ECHOSTAR BROADCASTS IN ANALOG FORMAT

7   AND THE BOXES RECEIVE ANALOG FORMAT, THAT IS JUST WRONG.  WHAT

8   ECHOSTAR BROADCASTS IS DIGITAL FORMAT, AND SPECIFICALLY MPEG

9   FORMAT.  IT IS CARRIED TO THE SATELLITE AND CARRIED DOWN FROM

10  A SATELLITE TO THE BOX ON AN ANALOG CARRIER WAVE, LIKE EVERY

11  OTHER KIND OF TELEVISION THAT IS BROADCAST.

12      THE COURT: WHY IS THAT IMPORTANT IN THE COURT'S

13  CONSIDERATION OF THESE VARIOUS MOTIONS?

14      MS. KREVANS: BECAUSE WHAT MR. IANCU WANTS THE COURT

15  TO DO IS TO TREAT THE PROCESS IN THE BOX OF RECOVERING THE

16  DIGITAL DATA FROM THE ANALOG CARRIER WAVE AS A CONVERSION OF

17  THAT ALREADY MPEG FORMATTED DATA INTO MPEG FORMAT, WHEN, IN

18  FACT, IT IS ALREADY IN MPEG FORMAT, AND NO ONE DISPUTES THAT,

19  INCLUDING TIVO'S OWN EXPERT.  SO THIS NOTION OF ANALOG FORMAT,

20  THAT'S A MISNOMER.  IT'S AN ANALOG CARRIER WAVE, THE SAME KIND

21  OF ANALOG CARRIER WAVE THAT CARRIES ANALOG FORMAT TELEVISION

22  TO YOUR HOUSE.

23      IF YOU WERE IN THE TV STUDIO THAT WAS BROADCASTING OLD

24  STYLE, JUST REGULAR OLD ANALOG TELEVISION, WHAT THEY CALL NTSC

25  IN THE U.S., YOU COULD, THAT BROADCAST COULD MAKE IT FROM ONE

1 ROOM OF THE STUDIO TO THE NEXT ONE, BUT IT COULDN'T MAKE IT TO

2 YOUR HOUSE TWENTY MILES AWAY BECAUSE THE SIGNAL IS JUST NOT

3 STRONG ENOUGH. THEY PUT IT ON AN ANALOG CARRIER WAVE TO

4 BROADCAST IT TO YOUR HOUSE, BUT IT IS ANALOG FORMAT

5 TELEVISION.

6 NOW, IF IT'S DIGITAL FORMAT TELEVISION, AND IF IT IS

7 SPECIFICALLY MPEG, THE SAME THING IS TRUE. TO GET IT FAR

8 AWAY, IN THIS CASE SPECIFICALLY TO A SATELLITE, IT IS

9 MODULATED ONTO AN ANALOG CARRIER WAVE. THAT IS NOT ANALOG

10 FORMAT TELEVISION, AND THE PATENT ACTUALLY SAYS SO, SO WE WILL

11 LOOK AT THAT.

12 SO I, ALSO IN THE INTEREST OF TIME, AM JUST GOING TO

13 ADDRESS A COUPLE OF KEY POINTS ABOUT THESE HARDWARE CLAIMS,

14 CLAIMS 1 AND 31. AND THE TWO POINTS I AM GOING TO ADDRESS ARE

15 THIS CONVERSION POINT, AND THEN THE SEPARATION AND ASSEMBLY

16 POINT. I THINK THEY ARE BOTH VERY IMPORTANT, ALTHOUGH WE HAVE

17 MANY OTHER ARGUMENTS, BUT THEY ALSO ARE THINGS WHERE I THINK

18 VISUALS ARE QUITE HELPFUL. SO, WE DON'T CONVERT, AS I SAID,

19 WE DON'T SEPARATE AND ASSEMBLE. WITH RESPECT --

20 THE COURT: WHAT IS AN UP LINK CENTER?

21 MS. KREVANS: UP LINK IS JUST WHAT IS REFERRED, WHAT

22 IS USED IN THE INDUSTRY TO REFER TO THE PROCESS OF SENDING THE

23 SIGNAL UP TO THE SATELLITE. THAT IS CALLED UP LINKING RATHER

24 THAN BROADCASTING, AND THEN COMING DOWN FROM THE SATELLITE IS

25 REFERRED TO AS BROADCASTING.

1   THE COURT: AND YOU ARE SAYING IT IS BROADCAST FROM

2   THE UP LINK CENTER TO THE SATELLITE IN MPEG FORMAT?

3   MS. KREVANS: RIGHT. THAT IS ABSOLUTELY THE CASE.

4   THE COURT: BUT BACK FROM THE SATELLITE IN ANALOG --

5   NO, DIGITAL?

6   MS. KREVANS: STILL MPEG, STILL MPEG FORMAT. IT IS

7   ON AN ANALOG CARRIER WAVE THE WHOLE TIME. SO THE ANALOG, THE

8   WAY IT WORKS IS THE MAIN UP LINK CENTER IS IN CHEYENNE,

9   WYOMING. ALL THE CONTENT IS GATHERED THERE FROM CONTENT

10  PROVIDERS. EVERY SPECIFIC PROGRAM SERVICE HAS A SET OF

11  PROCESSING, INCLUDING A BIG INDUSTRIAL SIZE MPEG CONVERTER.

12  THE PROGRAMMING IS DIGITIZED, IT'S COMPRESSED, THAT IS THE

13  MPEG CONVERSION, AND THEN IT GETS MODULATED ONTO, GETS

14  MULTIPLEXED, PUT TOGETHER WITH OTHER PROGRAMS BECAUSE YOU ARE

15  GOING TO SEND EIGHT OR NINE TOGETHER AT ONCE ON ONE SET OF

16  BAND WIDTH. THEN IT IS MODULATED ON TO THIS ANALOG CARRIER

17  WAVE AT VERY HIGH FREQUENCY, BECAUSE YOU NEED THAT TO GET UP

18  TO THE SATELLITE. AND THE TRANSIT UP THE SATELLITE IS JUST

19  CALLED UP LINKING RATHER THAN BROADCASTING. COMING DOWN IT IS

20  CALLED BROADCASTING. THE WHOLE THING YOU CAN THINK OF AS A

21  BROADCAST.

22  SO, LET'S GO ON AND TALK ABOUT CONVERSION. THE CLAIM, AS

23  MR. IANCU SAID, REQUIRES THAT THE SET UP BOX CONVERTS THE

24  SPECIFIC PROGRAM INTO AN MPEG FORMATTED STREAM FOR INTERNAL

25  TRANSFER MANIPULATION. NOW, THE PATENT DOESN'T SAY ANYTHING

1   TO SUGGEST THAT RECOVERING ALREADY MPEG FORMATTED DIGITAL DATA

2   OFF AN ANALOG CARRIER WAVE IS BAD CONVERSION.   IN FACT, IT

3   TELLS YOU EXPLICITLY THAT IT ISN'T.

4        IN THE PATENT, AND THIS IS ALL AT THE TOP OF COLUMN 2,

5   THERE IS AN EXPRESS DISTINCTION BETWEEN CONVERTING A BROADCAST

6   SIGNAL TO MPEG FORMAT FROM EXTRACTING A PRE-EXISTING MPEG

7   FORMATTED DATA FROM A SATELLITE SIGNAL.   AND THE CLAIMS, OF

8   COURSE, REQUIRE THE CONVERSION.

9        NOW, LET'S LOOK AT WHAT THE PATENT ACTUALLY SAYS.   IT

10  DISTINGUISHES BETWEEN THESE TWO, THAT IS, AN INCOMING ANALOG

11  STREAM AND INCOMING DIGITAL STREAM.   BOTH OF THESE COME INTO

12  THE RECEIVER ON AN ANALOG CARRIER WAVE.   BUT THE NATURE OF THE

13  SIGNAL IS DIFFERENT.   AND IF WE GO TO THE NEXT SLIDE WE CAN

14  SEE IN THE PATENT AT THE TOP OF COLUMN 2 WHERE IT EXPLICITLY

15  SHOWS YOU WHY MR. IANCU IS WRONG IN SAYING THE ISSUE HERE IS

16  THE CARRIER WAVE IS ANALOG.

17       IT TALKS ABOUT THE EMBODIMENT ACCEPTING TELEVISION IN

18  MULTITUDE OF FORMS.   FOR EXAMPLE, ANALOG FORMS, SUCH AS NTSC

19  OR PAL, PAL IS JUST EUROPEAN ANALOG, AND DIGITAL FORMS SUCH AS

20  DSS, DBS, AND ATSC.   NOW EVERYBODY AGREES ECHOSTAR USES A

21  DIGITAL FORM CALLED DVB.   IT IS LIKE DSS, IN ESSENCE, LIKE DSS

22  AND DBS.   IF WE CAN GO BACK TO THAT FOR A MOMENT.

23       YOU CAN SEE HERE WHEN THE PATENT TALKS ABOUT WHETHER

24  SOMETHING IS ANALOG OR DIGITAL, IT IS REFERRING TO THESE

25  DIGITAL SATELLITE BROADCASTS AS DIGITAL FORMS.   NOW, THEY ARE

1  COMING IN ON AN ANALOG CARRIER WAVE, BUT IT CONSIDERS THEM

2  DIGITAL FORMS AND THEY ARE ALREADY MPEG.  AND NOW IT IS GOING

3  TO TELL US WE DO DIFFERENT THINGS TO EACH OF THESE.  ANALOG

4  FORMS ARE CONVERTED TO MPEG.  THEY HAVE TO BE BECAUSE THEY

5  NEED TO BE COMPRESSED SO THEY CAN BE STORED.  DIGITAL FORMS,

6  THESE ARE ALREADY PREFORMATTED MPEG STREAMS COMING IN ON THAT

7  CARRIER WAVE, AND THEY ARE EXTRACTED FROM THE SIGNAL AND

8  PASSED ON TO THE REST OF THE BOX.  AND NOW BOTH FORMS LOOK THE

9  SAME.  ONE ALREADY CAME IN COMPRESSED IN MPEG.  THE OTHER ONE,

10  THE ANALOG, WE HAVE CONVERTED IN THIS PATENT.

11      BUT ECHOSTAR DOESN'T DO THAT BECAUSE WE ARE PREFORMATTED.

12  BUT NOTHING HERE TELLS YOU WHAT WE CONSIDER THE DIGITAL TO BE

13  ANALOG BECAUSE IT CAME IN ON A CARRIER WAVE.  THIS PATENT

14  CONSIDERS THAT DIGITAL TO BE DIGITAL, BECAUSE THAT IS THE

15  NATURE OF THE TELEVISION INFORMATION THAT IS COMING IN.  IF WE

16  COULD GO ON.

17      NOT ONLY DOES THE INTRODUCTION OF THE PATENT SAY THIS,

18  BUT IF YOU LOOK AT THE FIGURES YOU CAN SEE THE EXACT SAME

19  THING.  THIS IS FIGURE 7, WHICH IS A BUNCH OF THE KEY HARDWARE

20  COMPONENTS INVOLVED.  YOU SEE ON THE LEFT THERE IS AN MPEG

21  ENCODER.  AND MY BOX THERE IS JUST SIMPLY THE TEXT THAT

22  DESCRIBES THIS FIGURE.  WE PUT A RED BOX AROUND THE MPEG TO

23  HIGHLIGHT IT.

24      NOW, WHAT DOES THE PATENT ACTUALLY SAY ABOUT THIS?  IT

25  SAYS: IF THE INPUT STREAM IS ALREADY IN MPEG FORMAT, AS THE

1   ECHOSTAR BROADCAST IS, THERE IS NO NEED FOR THE MPEG ENCODER.

2   IF THE DIGITAL TV SIGNAL IS BEING PROCESSED INSTEAD, THE MPEG

3   ENCODER IS REPLACED WITH A DEMULTIPLEXER.   THAT IS A PIECE OF

4   HARDWARE THAT EXTRACTS FROM THE TRANSPORT MPEG STREAM THE

5   PARTICULAR PROGRAM AUDIO AND VIDEO THAT YOU WANT TO WATCH.

6       SO, WE KNOW IN THE WORDS OF THE PATENT THAT THE

7   CONVERSION THAT IS BEING TALKED ABOUT HERE IS A CONVERSION OF

8   ANALOG FORMATTED TELEVISION, NTSC FORMAT INTO MPEG.   IT IS NOT

9   A CONVERSION THAT APPLIES TO PREFORMATTED MPEG STREAMS LIKE

10  ECHOSTAR'S.   YES, THOSE STREAMS HAVE TO BE TAKEN BACK OFF THE

11  ANALOG CARRIER WAVE FOR FURTHER PROCESSING IN THE BOX, BUT THE

12  NATURE OF THE INFORMATION THE CARRIER WAVE WAS CARRYING,

13  DIGITAL MPEG.

14      AND, IN FACT, DR. GIBSON, TIVO'S EXPERT, HAS ADMITTED

15  THIS FACT THAT THE STREAM IS ALWAYS MPEG AS IT TRAVELS ON, AND

16  WE HAVE SUBMITTED THAT TO THE COURT, THAT TESTIMONY TO THE

17  COURT IN ONE OF OUR EXHIBITS TO THE SUMMARY JUDGMENT MOTION.

18  HE DOESN'T DISPUTE THAT IT IS CONVERTED TO MPEG IN CHEYENNE.

19  HE DOESN'T DISPUTE THAT AS IT IS TRAVELING THROUGH THE AIR IT

20  IS AN MPEG FORMATTED STREAM.   WHAT HE SAYS, IF YOU HAD HIM

21  HERE TODAY, IS, AND I ASKED HIM ABOUT THIS IN HIS DEPOSITION,

22  IS HE SAYS THESE OTHER THINGS ARE ALSO CONVERSIONS.   THEY ARE

23  FURTHER CONVERSIONS OF THAT INFORMATION, BUT HE DOESN'T

24  DISPUTE THAT IT IS MPEG ALL ALONG.   MR. IANCU IS ACTUALLY

25  MAKING A DIFFERENT ARGUMENT THAN THE ONE THAT HIS TECHNICAL

1   EXPERT CAME UP WITH TO TRY TO JUSTIFY THEIR POSITION.

2       SO, BOTTOM LINE, IT IS UNDISPUTED WE FORMAT BEFORE WE

3   BROADCAST.  IT IS ALREADY MPEG.  IT IS NEVER CONVERTED TO

4   MPEG.  IT IS CARRIED ON AN ANALOG CARRIER WAVE.  IT IS

5   RECOVERED FROM THE CARRIER WAVE.  THAT IS NOT THE CONVERSION

6   OF THIS PATENT.

7       NOW, LET'S TALK A LITTLE BIT ABOUT THE SEPARATE AND

8   ASSEMBLE POINT.  WE CAN JUST SKIP THESE SLIDES.  THERE WE GO.

9       SO CLAIM 1 HAS A SERIES OF ELEMENTS THAT ARE RELEVANT TO

10  THIS SEPARATION POINT.  IT REQUIRES THAT THE MPEG STREAM OF

11  THE CLAIM, WHICH HAS BEEN PRODUCED BY THIS CONVERSION PROCESS,

12  IS SEPARATED INTO ITS VIDEO AND AUDIO COMPONENTS.  IT REQUIRES

13  THAT THOSE COMPONENTS BE STORED ON A STORAGE DEVICE.  THEN IT

14  REQUIRES THAT THIS OTHER CLAIM ELEMENT, THIS OUTPUT SECTION,

15  EXTRACTS THE VIDEO AND AUDIO COMPONENTS BACK OFF THE STORAGE

16  DEVICE AND ASSEMBLES THEM INTO AN MPEG STREAM.

17      WE PUT TOGETHER A GRAPHIC THAT IT SIMPLY ILLUSTRATES

18  THIS.  YOU HAVE AN MPEG STREAM.  IT IS INTERLEAVED,

19  INTERMINGLED VIDEO AND AUDIO.  THEY ARE SEPARATED INTO THEIR

20  VIDEO AND AUDIO COMPONENTS.  THEY ARE STORED.  WHEN YOU WANT

21  TO PLAY IT BACK, THE BOX EXTRACTS IT FROM STORAGE, AND THEN

22  THE CLAIM REQUIRES ASSEMBLE SAID VIDEO AND AUDIO COMPONENTS

23  INTO AN MPEG STREAM.

24      NOW, WHAT ACTUALLY HAPPENS IN THE ECHOSTAR BOXES?

25  ACTUALLY, I'M SORRY, GO BACK.  LET'S LOOK AT PICTURE 3, KARL.

1       MR. IANCU SAYS, WELL, THIS SEPARATION DOESN'T HAVE TO BE

2   ACTUAL SEPARATION.  IT CAN BE ANALYSIS.  IT CAN BE CREATION OF

3   AN INDEX THAT TELLS YOU WHERE WITHIN THE STREAM THESE VIDEO

4   AND AUDIO COMPONENTS ARE.  WELL, THAT IS WRONG FOR TWO

5   REASONS.

6       FIRST OF ALL, IT IS WRONG UNDER THE PATENT BECAUSE THE

7   COURT DECLINED, DID NOT SAY HERE IS EXACTLY WHAT THE WORD

8   SEPARATE MEANS.  IT DID SAY IT DOESN'T MEAN THE SAME THING AS

9   ANALYZE.  THE PLAIN WORD SEPARATE DOES MEAN TAKE THESE TWO

10   THINGS THAT ARE TOGETHER AND PUT THEM APART.  IT DOESN'T MEAN

11   GIVE GRADES THAT IF YOU LOOK THEM UP WILL TELL YOU WHO GOT

12   WHAT GRADE.  IN MR. IANCU'S LAW SCHOOL EXAMPLE, SEPARATION

13   WOULD NOT BE GIVING PEOPLE GRADES THAT ARE ON A LIST

14   SOMEWHERE.  IT WOULD BE OKAY, IN FIRST SEMESTER THESE PEOPLE

15   DID WELL, THESE PEOPLE DIDN'T DO WELL.  SECOND SEMESTER, YOU

16   PEOPLE THAT DID WELL, YOU ARE IN THAT CLASSROOM OVER THERE.

17   YOU PEOPLE THAT DIDN'T DO SO WELL, YOU ARE UPSTAIRS IN A

18   DIFFERENT CLASSROOM.

19       THAT'S WHAT THE PLAIN MEANING OF THE WORD MEANS.  AND THE

20   PATENT SHOWS US THAT THAT'S EXACTLY WHAT THE PATENT MEANS,

21   TOO.  THAT WAS FIGURE 3 WE WERE LOOKING AT.  AND WHAT WE HAVE

22   DONE JUST BECAUSE FIGURE 3 HAS ALL THESE LITTLE NUMBERS, THE

23   TEXT TELLS YOU WHAT THEY MEAN.  THIS IS FIGURE 3 WITH THE WORDS

24   FILLED IN TO SHOW YOU WHAT THE TEXT SAYS THESE NUMBERS MEAN.

25   THE LINE IN THE MIDDLE, 301, IS THE INCOMING MPEG STREAM.

1   THIS ISN'T OUR CHARACTERIZATION.   IT'S WHAT THE SPECIFICATION

2   ACTUALLY SAYS.   IT IS INTERMINGLED VIDEO AND AUDIO.

3         THE LINE ABOVE 308 IS THE SEPARATE VIDEO STREAM, AND THE

4   LINE BELOW, 309, SEPARATE AUDIO STREAM.   THOSE LITTLE LINES

5   THAT GO FROM THE A'S AND B'S IN THE MIDDLE STREAM TO THE TOP

6   AND BOTTOM ARE THERE IN THE ORIGINAL FIGURE AND THEY SHOW YOU

7   THAT WHAT IS ACTUALLY HAPPENING HERE IS STREAMS ARE BEING

8   CREATED ONCE VIDEO ONLY AND ONCE AUDIO ONLY.   AND THE PATENT

9   GOES ON IN THE VERY NEXT FIGURE, FIGURE 4, AND IT SHOWS YOU

10  THAT WHAT HAPPENS TO THOSE STREAMS IS THEY ARE SEPARATELY

11  STORED.   AGAIN, THIS IS JUST A PATENT FIGURE, AND THE LABELS

12  WE PUT ON IT ARE THE LABELS THAT THE SPECIFICATION PUTS ON THE

13  NUMBERS IN THE FIGURE, SO YOU DON'T HAVE TO LOOK THEM UP

14  SEPARATELY.

15        THAT THING AT THE TOP, 402, IS A VIDEO DMA ENGINE.   A DMA

16  ENGINE IS A LITTLE PIECE OF HARDWARE THAT PUSHES DATA INTO A

17  BUFFER, VIDEO ONLY, AND 410 IS A VIDEO ONLY BUFFER.   403 DOWN

18  BELOW, LET'S STAY THERE FOR A SECOND, KARL.   403 DOWN BELOW,

19  AUDIO DMA ENGINE PUSHING AUDIO ONLY DATA INTO AN AUDIO ONLY

20  BUFFER.   THIS IS ACTUAL SEPARATION.   IT IS JUST WHAT THE WORD

21  SAYS.

22        NOW, IF WE GO ON, WHAT ACTUALLY HAPPENS TO THE ECHOSTAR

23  PRODUCTS?   WE HAVE TWO FAMILIES OF PRODUCTS, ONE OF WHICH WE

24  CALL THE ECHOSTAR BROADCOM PRODUCTS, BECAUSE ALTHOUGH THERE

25  ARE DIFFERENCES AMONG THEM, ALL OF THEM USE A CHIP MADE BY

1  BROADCOM, AND IT HAS SOME OF THE KEY COMPONENTS WITHIN THE

2  CHIP.   IN THESE PRODUCTS THE INCOMING MPEG STREAM, WHICH COMES

3  IN INTERLEAVED, IS NEVER SEPARATED INTO VIDEO AND AUDIO

4  COMPONENTS.   THE PRODUCTS SIMPLY LOOK AT THE BIG TRANSPORT

5  STREAM WITH EIGHT OR NINE PROGRAMS WORTH OF VIDEO AND AUDIO

6  MIXED UP IN IT, PULL OUT THE AUDIO AND VIDEO TOGETHER FOR THE

7  PROGRAM THAT YOU WANT TO RECORD, AND PUT THAT STREAM STILL

8  INTERLEAVED, STILL IN THIS TRANSPORT INTERLEAVED FORMAT, ONTO

9  THE HARD DRIVE THROUGH A SERIES OF BUFFERS.   NEVER SEPARATED.

10  NO SEPARATION, NO INFRINGEMENT.

11       NOW, WHAT ABOUT THE OTHER FAMILY OF PRODUCT, THESE ONES

12  WE CALL THE 50X PRODUCTS, BECAUSE THEY ALL HAVE A NUMBER THAT

13  STARTS WITH A 50 SOMETHING?   THESE ARE A DIFFERENT CHIP.   THEY

14  WERE INTERIM SERIES OF PRODUCTS THAT ECHOSTAR HAD FOR A WHILE,

15  DIFFERENT DESIGN, DIFFERENT CONFIGURATION.   STILL COMING IN IN

16  A TRANSPORT STREAM WITH EIGHT OR NINE PROGRAMS ALL MIXED UP,

17  STILL HAVE THIS PIECE OF HARDWARE, THE PID FILTER, THAT PULLS

18  OUT THE AUDIO AND VIDEO FOR THE PROGRAM YOU WANT TO RECORD.

19  BUT IN THIS CASE, IT SEPARATES THE AUDIO AND VIDEO.   AND THESE

20  PRODUCTS, THEY ARE REALLY SEPARATED.   JUST LIKE THE PATENT

21  FIGURE SHOWS, VIDEO GOES INTO A VIDEO BUFFER AND THEN TO A

22  VIDEO FILE ON THE HARD DRIVE, AUDIO INTO AN AUDIO BUFFER AND

23  TO AUDIO FILE ON THE HARD DRIVE.   STORED SEPARATELY ON THE

24  HARD DRIVE, BUT WHEN THEY ARE PULLED OFF, THEY ARE NEVER PUT

25  BACK TOGETHER.

1    SO IN THESE PRODUCTS THERE IS SEPARATION, BUT THERE IS NO

2  ASSEMBLY.  THE PATENT REQUIRES ASSEMBLY AFTER STORAGE BACK

3  INTO AN MPEG STREAM.  THERE ISN'T ANY.  SO, THEY ALSO DO NOT

4  INFRINGE, BUT FOR A DIFFERENT REASON THAN THE FIRST FAMILY OF

5  PRODUCTS.

6    SO, I WANTED TO GRAPHICALLY SHOW THIS.  THIS IS WHAT THE

7  PATENT REQUIRES, SEPARATION STORAGE ASSEMBLY.  THIS NEXT

8  FIGURE IS A LITTLE COMPLICATED.  THIS IS THE BROADCOM CHIP

9  PRODUCTS.  WE HAVE A MULTI PROGRAM TRANSPORT STREAM COMING IN

10  FROM THE SATELLITE.  WE PICK OUT FROM IT THE INFORMATION FOR

11  ONE PROGRAM, VIDEO AND AUDIO, INTERLEAVED, IN MPEG FORMAT.

12  GOES TO A BUFFER TOGETHER.  GOES TO THE HARD DRIVE TOGETHER.

13  WANT TO PLAY IT BACK, YOU PULL IT OFF OF THE HARD DRIVE ON THE

14  RIGHT, BACK INTO A BUFFER.  THE DECODER NOW IS PULLING THIS

15  INFORMATION TO PLAY IT BACK.  STILL VIDEO AND AUDIO TOGETHER.

16  WE JUST SEND IT TO BOTH VIDEO AND AUDIO DECODERS.  IT IS STILL

17  TOGETHER, SO WHAT WE DO IS WE SEND THIS STREAM TO BOTH

18  DECODERS, VIDEO AND AUDIO TOGETHER GOING TO BOTH DECODERS.

19    AT THE FRONT OF THE DECODER THERE IS A FILTER SO THE

20  VIDEO DECODER GETS ONLY VIDEO INFO.  THE AUDIO DECODER GETS

21  ONLY AUDIO INFO. THERE WAS NEVER ANY SEPARATION.  THIS THING

22  TRAVELED THROUGH THE WHOLE BOX ALL THE WAY TO THE DECODERS AS

23  INTERLEAVED AUDIO AND VIDEO.

24    NOW, MR. IANCU HAS TO CONFRONT THIS FACT.  I'M SORRY,

25  THIS IS JUST THE ILLUSTRATION OF -- IF WE GO ON TO THE OTHER,

1    THE NEXT SLIDE, THIS IS JUST THE ILLUSTRATION OF THE BOXES

2    THAT DO SEPARATE, AND YOU SEE IN THIS ILLUSTRATION THERE IS

3    SEPARATION, THERE IS SEPARATE STORAGE, BUT THEY ARE NEVER PUT

4    BACK TOGETHER.   NO INFRINGEMENT.

5        NOW, WHAT ABOUT THIS ARGUMENT THAT LOGICAL OR VIRTUAL

6    SEPARATION IS ENOUGH?   WHAT DID MR. IANCU POINT TO AS THIS

7    LOGICAL OR VIRTUAL SEPARATION?   HE POINTS TO THIS INDEXING

8    THAT SUPPOSEDLY OCCURS, WHICH HE SAYS DISTINGUISHES THE AUDIO

9    AND VIDEO, ALTHOUGH THEY ARE ALL MIXED UP TOGETHER IN ONE

10   STREAM FROM ONE ANOTHER.   WELL, THERE IS TWO PROBLEMS WITH

11   THAT.

12       FIRST OF ALL, THIS ARGUMENT FLIES IN THE FACE OF THE

13   COURT'S CLAIM CONSTRUCTION; AND SECOND, IT'S FACTUALLY WRONG.

14   SO LET'S LOOK AT THE CLAIM CONSTRUCTION POINT FIRST, IF WE GO

15   ON TO THE NEXT SLIDE.

16       IN TIVO'S SUMMARY JUDGMENT MOTION, BASICALLY WHAT THEY

17   ARE ASKING THE COURT TO DO IS SAY THAT THIS INDEXING PROCESS,

18   THIS START CODE DETECT PROCESS SATISFIES BOTH THE PARSE

19   REQUIREMENT, WHICH THE COURT CONSTRUED AS ANALYZED, AND THE

20   SEPARATE REQUIREMENT, WHICH MR. IANCU WOULD ALSO LIKE THE

21   COURT TO SAY ACTUALLY MEANS ANALYZE, ALTHOUGH HE CALLS IT

22   DISTINGUISH TO TRY TO MAKE IT SOUND LIKE A DIFFERENT WORD.

23   BUT, HE IS POINTING TO THE SAME INDEXING TO SATISFY BOTH.

24       IN CLAIM CONSTRUCTION, THE COURT AGREED THAT PARSE MEANT

25   ANALYZE, BUT THE COURT SAID SEPARATE DOES NOT MEAN THE SAME

1    THING AS PARSE.  SO THIS ARGUMENT JUST DOESN'T WORK AS A

2    MATTER OF CLAIM CONSTRUCTION, WHICH HAS BEEN DETERMINED IN

3    THIS CASE, AND WHICH TIVO HASN'T ASKED TO HAVE RECONSIDERED AS

4    A MATTER OF JUST CLAIM PRINCIPLES WHERE TWO WORDS DON'T MEAN

5    THE SAME THING. IT CAN'T WORK.

6        NOW, IT ALSO HAPPENS TO BE FACTUALLY WRONG.  WHAT

7    ACTUALLY HAPPENS IN THE START CODE DETECT PROCESS IN THESE

8    ECHOSTAR BROADCOM BOXES, AS IS SHOWN BY THE EVIDENCE THAT WAS

9    SUBMITTED WITH ECHOSTAR'S BRIEF, THE AUDIO FRAMES ARE NEVER

10   INDEXED.  WHAT HAPPENS IS THIS STREAM IS COMING ALONG.  AND,

11   KARL, CAN WE JUST GO BACK TO ONE OF THE SLIDES THAT SHOWS THE

12   STREAM?

13       SO, IF YOU LOOK ON THE LEFT WHERE THE PID FILTER IS, YOU

14   SEE THERE IS STREAM WITH VVAVA.  THE START CODE DETECT, WHICH

15   IS IN THE CHIP RIGHT AFTER THE PID FILTER, AND I THINK IN THE

16   BINDER THAT TIVO HAS GIVEN YOU, THERE IS A PICTURE OF THIS

17   PART OF THE CHIP.  THE START CODE DETECT COMES RIGHT AFTER

18   THAT PID FILTER.  AND IT LOOKS AT THE STREAM AS IT GOES ALONG,

19   AND AS MR. IANCU SAID, IT IS LOOKING SAYING: WHERE IS THERE AN

20   IMPORTANT EVENT?  WELL, IN THIS CHIP IN THIS BOX THE IMPORTANT

21   EVENT IS WHERE DO I SEE THE START OF A VIDEO FRAME?  THE START

22   CODE DETECT MAKES AN INDEX OF THE LOCATION OF THE START OF

23   EVERY VIDEO FRAME.  IT IGNORES THE AUDIO.  IT IS IN THERE.  IT

24   IS ALL MIXED UP WITH VIDEO.  IT IS IGNORED BY THIS INDEX.

25   THERE IS NO DISTINGUISHING IN THIS INDEX BETWEEN AUDIO AND

1  VIDEO. THERE IS JUST A RECORD OF THE LOCATION OF THE START OF

2  EVERY VIDEO FRAME, AND THAT'S IT. SO FACTUALLY, THIS ARGUMENT

3  DOES NOT WORK AS WELL. NOW --

4  　　　　THE COURT: AND THESE SAME ARGUMENTS BECOME THE BASIS

5  OF YOUR MOTION FOR NONINFRINGEMENT?

6  　　　　MS. KREVANS: TECHNICALLY, OUR MOTION IS A REQUEST

7  FOR SUMMARY JUDGMENT ON THEIR MOTION. BUT, YES, THAT'S RIGHT.

8  I TAKE IT FROM WHAT YOUR HONOR SAID AT THE BEGINNING, YOU

9  WOULD LIKE TO HEAR THEIR REPLY ON THIS BEFORE WE ADDRESS THE

10 SOFTWARE ISSUES OF OUR MOTION?

11 　　　　THE COURT: YES.

12 　　　　MS. KREVANS: OKAY. I WILL SIT DOWN, THEN.

13 　　　　THE COURT: REPLY.

14 　　　　MS. KREVANS: YOUR HONOR, WHILE THEY ARE SWITCHING

15 COMPUTERS, I SHOULD HAVE SAID --

16 　　　　THE COURT: NOTEBOOKS.

17 　　　　MS. KREVANS: WE HAVE BINDERS AS WELL. I WAS GOING

18 TO HAND THOSE OUT SO EVERYONE HAS COPIES. THEY ALSO HAVE IN

19 THEM THE SLIDES FOR THE LATER PRESENTATION.

20 　　　　MR. IANCU: LET ME TAKE, YOUR HONOR, MS. KREVANS'

21 STATEMENTS IN ORDER. FIRST, ON THE CONVERSION POINT, THE

22 BOTTOM LINE IS THAT WHEN THE DATA TRAVELS FROM THE SATELLITE

23 TO EARTH IT IS NOT AN MPEG FORMATTED STREAM. TO BE AN MPEG

24 STREAM PURSUANT TO THE MPEG STANDARD, IT MUST BE DIGITAL.

25 THIS IS AGREED UPON BY THE PARTIES, AND IT IS IN THE MPEG

1   SPECIFICATION.

2          THE COURT: WHAT FORMAT, YET ONE MORE TIME, ARE YOU

3   SAYING IT IS TRANSMITTED IN FROM THE SATELLITE?

4          MR. IANCU: IT IS AN ANALOG FORMAT.  AND TO BE AN

5   MPEG FORMATTED STREAM, AS THE CLAIM REQUIRES, IT MUST BE

6   NECESSARILY CONVERTED FROM ANALOG TO DIGITAL.  THERE ARE

7   ADDITIONAL CONVERSIONS, THOUGH.  THE CLAIM REQUIRES NOT JUST

8   CONVERSION TO MPEG, IT REQUIRES CONVERSION TO MPEG STREAM FOR

9   INTERNAL TRANSFER AND MANIPULATION.  AND TO THAT END, THERE

10  ARE PLENTY OF CONVERSIONS PERFORMED UPON THE DATA BY THE

11  ECHOSTAR SYSTEM.

12      WE CAN SEE ANALOG TO DIGITAL CONVERSION, DEMODULATION,

13  FORWARD ERROR CORRECTION, SCRAMBLING AND DESCRAMBLING.  THESE

14  ARE ALL CONVERSIONS SO THAT THE DATA CAN BE IN A STANDARD

15  FORMAT, AS THE CLAIM REQUIRES, FOR INTERNAL TRANSFER AND

16  MANIPULATION.  JUST THE FACT THAT THE INFORMATION WAS

17  ORIGINALLY IN MPEG IS IRRELEVANT.  WHAT IS RELEVANT IS THAT IT

18  HAS GOT TO BE CONVERTED TO AN MPEG FORMATTED STREAM, WHICH

19  MEANS DIGITAL, FOR INTERNAL TRANSFER AND MANIPULATION.

20      DR. GIBSON, OUR EXPERT, NEVER AGREED, AS ECHOSTAR

21  ALLEGES, THAT THE DATA IS NOT AN MPEG FORMATTED STREAM.

22      NOW, ON TO THE SEPARATION AND ASSEMBLY POINT.  ANALYSIS

23  AND SEPARATION ARE DIFFERENT EVEN IN THE LOGICAL WORLD.  WHEN

24  YOU LOOK AT THE DATA AND YOU ANALYZE IT, YOU INSPECT IT, YOU

25  ARE DETERMINING WHAT IS VIDEO AND WHAT IS AUDIO, THAT IS THE

1   ANALYSIS.  THE RESULT OF THAT ANALYSIS IS THAT YOU CREATE A

2   FRAME INDEX IN THE ECHOSTAR SYSTEM, ALSO IN THE TIVO PATENT,

3   AN INDEX THAT CATEGORIZES THE VIDEO FRAMES, WHERE THEY ARE,

4   WHEN THEY CAME IN, AND WHERE IN MEMORY THEY ARE LOCATED.  THAT

5   IS THE SEPARATION.  ECHOSTAR ADMITS, AS MS. KREVANS JUST SAID,

6   THAT THE AUDIO FRAMES ARE NEVER INDEXED.  THEY ARE SO

7   SEPARATED FROM THE VIDEO FRAMES THAT THEY ARE NOT EVEN IN THE

8   INDEX.  THE INDEX IS PURELY REFERENCING THE VIDEO FRAMES.  IT

9   IS A VIDEO FRAME INDEX.

10      NOW, MS. KREVANS AND ECHOSTAR DISCUSSED THE ASSEMBLY, AND

11  THEY ARE ARGUING THAT SOME OF THEIR PRODUCTS DO NOT ASSEMBLE.

12  LET'S TAKE A QUICK LOOK AT WHAT THE PATENT MEANS BY ASSEMBLY,

13  AND THIS IS SLIDE 43 IN THE COURT'S BINDER.

14      THERE IS THE INDEX TABLE THAT HAS BEEN CREATED ON THE

15  INPUT SIDE.  NOW WHEN WE WANT TO ASSEMBLE THE DATA SO WE CAN

16  WATCH IT, THE INDEX TABLE IS ACCESSED, WHICH HAS VIDEO FRAME

17  INFORMATION, AND A STREAM IS ASSEMBLED.  ON OUTPUT, THE LAST

18  STEP WE SEE ON SLIDE 44, HERE TOWARDS THE END, AFTER THE DATA

19  HAS BEEN STORED, THEN IT IS EXTRACTED.  TWO STREAMS ARE

20  CREATED, A VIDEO STREAM AND AN AUDIO STREAM.  EACH ONE IS

21  ASSEMBLED.  EACH STREAM IS ASSEMBLED FROM THE HARD DRIVE AND

22  EACH ONE IS PURSUANT TO THE MPEG STANDARD, A PES STREAM AS IT

23  IS CALLED IN THE STANDARD.  THERE IS NO DISPUTE THAT STREAMS

24  ARE ASSEMBLED ON OUTPUT, AND ALL OF THEIR PRODUCTS ASSEMBLE

25  SUCH STREAMS.  AND WITH THAT I WILL --

1        THE COURT: THESE SEEM LIKE RATHER CLASSIC ISSUES OF

2   FACT FOR A JURY TO WORK THROUGH.   IT WOULD SEEM GENERALLY IT

3   IS AN UNWISE CHOICE ON THE COURT'S PART TO GRANT A SUMMARY

4   JUDGMENT TO THE PLAINTIFF ON INFRINGEMENT.   WHY IS MY

5   ASSESSMENT NOT CORRECT?   OBVIOUSLY, YOU HAVE SPENT THIRTY

6   MINUTES TELLING ME WHY, BUT HOW WOULD YOU SUMMARIZE THAT

7   QUICKLY?

8        MR. IANCU: WELL, IT VERY WELL MAY BE THAT ALTHOUGH

9   THERE ARE PLENTY OF AGREEMENTS AS TO HOW THE PRODUCTS OPERATE,

10  THE PARTIES MAY BE PERHAPS SPINNING THE FACTS IN DIFFERENT

11  WAYS.

12       THE COURT: THAT IS USUALLY MY EXPERIENCE, ESPECIALLY

13  IN THIS CASE.

14       MR. IANCU: ALL RIGHT.   THANK YOU, YOUR HONOR.

15       THE COURT: NOW WHAT, WHAT WOULD YOU LIKE TO TAKE UP

16  AT THIS TIME ON BEHALF OF ECHOSTAR?

17       MS. KREVANS: YOUR HONOR, ECHOSTAR HAS --

18       THE COURT: WOULD YOU LIKE TO COMMENT ON THE COURT'S

19  LAST QUESTION, WHY ARE THESE NOT SIMPLY CLASSIC ISSUES OF FACT

20  FOR A JURY TO DETERMINE?

21       MS. KREVANS: I THINK, YOUR HONOR, ALTHOUGH YOU WILL

22  CONSIDER THIS SPIN NO DOUBT, THAT THAT IS TRUE WITH RESPECT TO

23  THE MOTION --

24       THE COURT: THE PLAINTIFF'S MOTION, BUT NOT YOUR

25  MOTION?

1          MS. KREVANS: WELL, AND THERE IS REASON FOR THAT,

2   BECAUSE TO WIN THEY HAVE TO PROVE THAT WE INFRINGE EVERY

3   ELEMENT OF THE CLAIM, AND THERE ACTUALLY ARE SOME SIGNIFICANT

4   FACTUAL DISPUTES ON SOME OF THE ELEMENTS. WE JUST HAVE TO

5   SHOW THAT WE DON'T INFRINGE AT LEAST ONE. I DON'T THINK THERE

6   IS ANY FACTUAL DISPUTE, CERTAINLY WITH RESPECT TO THE

7   CONVERSION ISSUE, AND WE THINK WE ARE ENTITLED TO SUMMARY

8   JUDGMENT ON THAT.

9          THE REMAINING MOTIONS, THERE IS ECHOSTAR'S MOTION FOR

10  NONINFRINGEMENT ON THE SOFTWARE CLAIMS. TIVO BROUGHT A CROSS

11  MOTION ON THAT, WHICH, AS WE SAID IN OUR PAPERS, WE THINK WAS

12  IMPROPER. WE ALSO, IF THE COURT CONSIDERS IT, DO REQUEST

13  JUDGMENT ON THEIR MOTION AS WELL. THERE ARE TWO OTHER MOTIONS

14  THAT ARE CLAIMS DIRECTED, AND WHAT I WOULD LIKE TO DO IS JUST

15  TAKE ALL OF THOSE TOGETHER. AND THEN WHEN WE FINISH ALL OF

16  THOSE, AND BECAUSE THERE IS AN INVALIDITY MOTION AND A

17  DOCTRINE OF EQUIVALENTS MOTION, THERE ARE TWO MOTIONS THAT ARE

18  NOTHING TO DO WITH THE CLAIMS RELATING TO MARKING AND

19  WILLFULNESS.

20          THE COURT: THERE IS A DAMAGE, DAMAGE ISSUE.

21          MS. KREVANS: RIGHT. RIGHT. AND MR. KRAMER WILL

22  ARGUE THOSE, SO I WANT TO TAKE THE REST OF THE CLAIM DIRECTED

23  MOTIONS TOGETHER, AND IF WE COULD FINISH THOSE, THEN I THINK

24  WE COULD TURN TO THE SEPARATE TOPICS OF WILLFULNESS AND

25  DAMAGES.

1    I WANT TO JUST TALK ABOUT A COUPLE OF ISSUES ON THESE

2  SOFTWARE CLAIMS, AND THE TWO ISSUES I AM GOING TO TALK ABOUT

3  ARE THE OBJECT ISSUE AND AN ISSUE ABOUT THE PHYSICAL DATA

4  SOURCE AND WHETHER THEIR SOFTWARE THAT EXTRACTS DATA FROM IT.

5    LET ME START WITH THE OBJECT ISSUE, AND I WANT TO START

6  WITH CLAIM CONSTRUCTION. CAN YOU GO BACK A COUPLE THERE,

7  KARL? THANK YOU.

8    TIVO ASKED THE COURT TO CONSTRUE OBJECT TO MEAN A

9  COLLECTION OF DATA OR OPERATIONS, I.E., PORTIONS OF A COMPUTER

10  PROGRAM, BASICALLY, ANYTHING IN THE CODE. THE COURT DIDN'T DO

11  THAT. THE COURT SAID OBJECT MEANS A COLLECTION OF DATA AND

12  OPERATIONS. SO WHAT DID, WHAT DOES THAT MEAN? WELL, IN OUR

13  VIEW, THAT MEANS THERE ARE NO OBJECTS IN OUR CODE, NONE THAT

14  HAVE ANYTHING TO DO WITH THE FUNCTIONS OF THE OBJECTS OF THE

15  CLAIMS. NONE OF THE CUE SOFTWARE WAS WRITTEN AND ORGANIZED BY

16  THE PROGRAMERS AS A COLLECTION OF DATA IN OPERATIONS THAT

17  PERFORMS THE REQUIRED FUNCTIONS.

18    NOW, THE COURT WILL RECALL THAT THE CONSTRUCTION OF EACH

19  OF THESE FOUR OBJECTS, THE SOURCE, THE TRANSFORM, THE SINK,

20  AND THE CONTROL OBJECT, IN ESSENCE, WAS A COLLECTION OF DATA

21  AND OPERATIONS THAT PERFORMED A LIST OF FUNCTIONS, AND THEN

22  THE COURT PUT THE LIST IN. AND THE LIST WERE THINGS THAT WERE

23  TAKEN FROM WHAT THE CLAIMS SAID EACH OF THE OBJECTS HAD TO DO.

24  THERE IS NOT, WHEN YOU LOOK AT THE ECHOSTAR CODE, ANY

25  COLLECTION OF DATA AND OPERATIONS THAT PERFORMS THE LIST OF

1  FUNCTIONS THAT EACH OBJECT HAS TO DO. SO I AM GOING TO TALK

2  ABOUT THAT ISSUE, AND THEN I AM GOING TO TALK ABOUT THIS OTHER

3  EXTRACTION ISSUE.

4  BUT LET'S START WITH OBJECTS. THIS IS JUST TO REMIND US

5  THE BASIC ORGANIZATION OF THE SOFTWARE THAT IS CLAIMED IN THE

6  PATENT, SOURCES, TRANSFORM, SINKS. THE CONTROL OBJECT IS NOT

7  SHOWN IN THIS FIGURE. IT IS IN ANOTHER ONE RIGHT ABOVE THE

8  TRANSFORM. AND YOU SEE THE TRANSFORM IS SITTING THERE BETWEEN

9  THE SOURCE AND THE SINK, AND IT IS THE THING THAT CONTROLS

10  DATA GOING ON AND OFF THE HARD DRIVE AS WELL. IF WE COULD GO

11  TO THE NEXT SLIDE.

12  WHAT DID TIVO DO TO TRY TO COME UP WITH AN INFRINGEMENT

13  POSITION HERE GIVEN THAT ECHOSTAR PROGRAMERS DID NOT ACTUALLY

14  CODE USING OBJECTS? WELL, HERE IS WHAT THEY DID. THEIR

15  EXPERT, DR. GIBSON, WITH SOME ASSISTANCE FROM TIVO'S COUNSEL,

16  WENT THROUGH THE ECHOSTAR CODE WITH THE COURT'S OBJECT

17  CONSTRUCTION. ACTUALLY, THE FIRST TIME HE DID IT, WE DIDN'T

18  HAVE THE CONSTRUCTION YET, BUT THE SECOND TIME HE HAD IT. HE

19  SAID OKAY, I WILL START WITH THE SOURCE.

20  THE SOURCE HAS TO DO FOUR THINGS. IT HAS GOT FOUR

21  FUNCTIONS IT HAS GOT TO PERFORM. HE LOOKS THROUGH ALL OF THE

22  ECHOSTAR CODE, AND ANYWHERE, ANYWHERE IN THE WHOLE CODE BASE

23  THAT HE FOUND SOME CODE THAT DID ANY PART OF ANY OF THE THINGS

24  ON THAT LIST OF FOUR FUNCTIONS, HE SAID OKAY, I AM GOING TO

25  PUT THIS CODE FILE OR THIS ROUTINE ON MY SOURCE LIST, AND HE

1   MADE A LIST.

2       NOW, IT IS UNDISPUTED THAT THE ECHOSTAR PROGRAMERS DID

3   NOT ACTUALLY COLLECT ALL OF THOSE FUNCTIONS THAT ARE ON DR.

4   GIBSON'S LIST TOGETHER.   THEY ARE NOT COLLECTED TOGETHER, AND

5   THE DATA THAT THEY OPERATE ON IS NOT COLLECTED TOGETHER WITH

6   THEM.   THE COLLECTION THAT TIVO OFFERS TO SATISFY THE COURT'S

7   CONSTRUCTION IS NOT A COLLECTION IN THE ECHOSTAR CODE.   IT IS

8   A COLLECTION THAT WAS MADE BY DR. GIBSON.

9       NOW, LET'S TALK ABOUT HOW WE KNOW THAT TO BE TRUE.   WELL,

10  FIRST OF ALL, WE KNOW IT TO BE TRUE BECAUSE YOU WILL NOTICE IN

11  TIVO'S RESPONSE TO OUR MOTION, IN ANY OF THE BRIEFING THAT

12  THEY PUT IN, THEY NEVER POINTED TO ANY INSTANCE WHERE THEY

13  SAID HERE IS A FACTUAL SHOWING THAT THE DATA AND OPERATIONS TO

14  HAVE TO DO ALL THE THINGS THE SOURCE OBJECT CAN DO, FOR

15  EXAMPLE, ARE COLLECTED TOGETHER.   THEY JUST DIDN'T MAKE THAT

16  SHOWING. THAT'S BECAUSE IT'S NOT TRUE.

17      AND HERE IS SOMETHING EVEN BETTER.   TIVO'S EXPERT ADMITS

18  THAT HE DIDN'T DO AN ANALYSIS OF THAT KIND AT ALL.   SO, HE

19  CAN'T OFFER TESTIMONY THERE IS SUCH A COLLECTION, BECAUSE HE

20  DIDN'T LOOK TO SEE.

21      THIS IS FROM HIS DEPOSITION AND WE SEE WHAT HE SAYS.   THE

22  QUESTION:   AND THEN MAYBE WITH SOME HELP FROM MR. GIZA, YOU

23  LOOKED AT THE CODE AND FOUND WHEREVER IT OCCURRED IN THE CODE,

24  IN WHATEVER FILE, THE DIFFERENT PORTIONS OF THE CODE THAT

25  PERFORMED THE SOURCE OBJECT FUNCTIONS, RIGHT?   DR. GIBSON

1  SAID: I LOOKED IN THE CODE AND FOUND AS MUCH AS I COULD,

2  RIGHT.  AND THEN YOU MADE A LIST WHERE YOU FOUND THESE THINGS.

3  THAT'S YOUR SOURCE OBJECT COLLECTION, RIGHT?  SOMETHING LIKE

4  THAT.  A LIST WAS ACCUMULATED.  AND THEN I WENT BACK OVER IT

5  AGAIN.  RIGHT.  SO, HE MADE THE LIST AND HE CHECKED IT.  OKAY.

6  AND IN YOUR ANALYSIS OF THE CODE, IT WAS IRRELEVANT HOW THE

7  PROGRAMERS CHOSE TO STRUCTURE THE CODE AND WHETHER THEY

8  THEMSELVES GROUPED THEIR REQUIRED FUNCTIONS TOGETHER, RIGHT?

9  ANSWER: I DON'T KNOW IF IT IS IRRELEVANT NOW, SO WHETHER OR

10  NOT I LOOKED FOR THE FUNCTIONS AND I DIDN'T SEARCH FOR

11  GROUPINGS.

12      HE JUST LOOKED TO WHEREVER HE COULD FIND ALL THE THINGS

13  ON THE LIST OF FUNCTIONS, NO MATTER WHERE HE FOUND THEM, MADE

14  A LIST.  HE DIDN'T LOOK TO SEE IF THEY WERE COLLECTED

15  TOGETHER.  THAT GROUPINGS IS WHAT HE IS CALLING COLLECTIONS.

16      AND, THEN THERE IS A LITTLE MORE TESTIMONY THAT IS ALSO

17  QUITE PERTINENT HERE.  WE WERE STILL TALKING ABOUT THE SOURCE

18  OBJECT IN HIS DEPOSITION, BUT THE ANSWER ABOUT ALL THE OBJECTS

19  IS HE DID THEM ALL THE SAME.  WHEN YOU WENT LOOKING IN THE

20  CODE FOR THE SOURCE OBJECT, YOU DID NOT TRY TO PERFORM AN

21  ANALYSIS AS TO WHETHER THE PROGRAMERS IN WRITING THE CODE HAD

22  STRUCTURED THE CODE SO THAT THE CODE THAT PERFORMS THESE FOUR

23  FUNCTIONS WAS GATHERED TOGETHER ANY LOGICAL WAY?  ANSWER: I

24  THINK IT MIGHT BE A LITTLE DIFFERENT.  I DIDN'T SEE THAT IT

25  WAS GATHERED TOGETHER IN THAT WAY.  RIGHT THERE HE IS