UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | |
|---|---|
| TIVO INC., a Delaware corporation      )<br>       Plaintiff,    )<br>   vs.    )<br>1.  ECHOSTAR COMMUNICATIONS    )<br>CORPORATION, a Nevada corporation,    )<br>2.  ECHOSTAR DBS CORPORATION, a    )<br>Colorado corporation, 3.  ECHOSTAR    )<br>TECHNOLOGIES CORPORATION, a    )<br>Texas corporation, and 4.  ECHOSPHERE    )<br>LIMITED LIABILITY COMPANY, a    )<br>Colorado limited liability company,    )<br>5.  ECHOSTAR SATELLITE LLC, a    )<br>Colorado limited liability company,    )<br>       Defendants.    )<br>_____ )<br>AND RELATED COUNTERCLAIMS    )<br>_____ ) | Case No. 2-04CV-01 (Judge Folsom) |

**TIVO'S MOTION FOR ECHOSTAR TO BE HELD IN CONTEMPT FOR VIOLATION OF THIS COURT'S PERMANENT INJUNCTION**

TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT OF FACTS ...................................................................................2

III.  EchoStar Should Be Held in Contempt For Deliberately Ignoring The
      Terms Of This Court's Permanent Injunction. ...................................................5

      A.    Applicable Law......................................................................................5

      B.    EchoStar's Failure to Abide by the Plain Language of the
            Injunction Constitutes Contempt. ..........................................................7

      C.    EchoStar Has Chosen Not To Comply With Court Orders Before. ...................12

IV.   TiVo Reserves Its Claim For Damages For EchoStar's Contemptuous
      Conduct ..............................................................................................................14

V.    Conclusion .........................................................................................................15

<u>TABLE OF AUTHORITIES</u>

Page(s)

<u>**Cases**</u>

*Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.,*
　　32 U.S.P.Q.2d 1747 (S.D. Tex. July 12, 1994), *aff'd in part and rev'd in*
　　*part on other grounds*, 154 F.3d 1345, 1356 (Fed. Cir. 1998) ................................. 12, 16

*Broccoli v. EchoStar Communications Corp.,*
　　229 F.R.D. 506 (D. Md., Aug 04, 2005)........................................................... 14

*CBS Broadcasting Inc. v. Northwestern Ins. Co.,*
　　Misc. Action No. 02-400, 02-402 (W.D. Pa. April 17, 2003), *rev'd on*
　　*procedural grounds*, 125 Fed. Appx. 455 (3d Cir. 2005)................................. 14

*CBS Broadcasting, Inc. v. EchoStar Communications Corp.,*
　　276 F. Supp. 2d 1237 (S.D. Fla. 2003), *aff'd in part and rev'd in part on*
　　*other grounds*, 450 F.3d 505 (11th Cir. 2006)........................................... 13, 14

*Dow Chem. Co. v. Chem. Cleaning, Inc.,*
　　434 F.2d 1212 (5th Cir. 1970) ................................................................. 15, 16

*Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.,*
　　305 F.3d 1303 (Fed. Cir. 2002)...................................................................... 6

*EchoStar Satellite Corp. vs. Young Broadcasting Inc.,*
　　2001 WL 876964, 16 F.C.C. Rec. 15,070, ¶ 12 (F.C.C. Aug. 6, 2001)........................... 14

*FDIC v. LeGrand,*
　　43 F.3d 163 (5th Cir. 1995) ......................................................................... 6

*Fla. Steel Corp. v. NLRB,*
　　648 F.2d 233 (5th Cir. 1981) ..................................................................... 15

*Gompers v. Buck's Stove & Range Co.,*
　　221 U.S. 418 (1911)............................................................................... 7, 8

*Leman v. Krentler-Arnold Hinge Last Co.,*
　　284 U.S. 448 (1932)................................................................................ 16

*Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC,*
　　478 U.S. 421 (1986)................................................................................. 7

*Martin v. Trinity Industries, Inc.,*
　　959 F.2d 45 (5th Cir. 1992) ........................................................................ 6

*McComb v. Jacksonville Paper Co.,*
　　336 U.S. 187 (1949)............................................................................ 15, 16

*Miggio v. Zeitz,*
　　333 U.S. 56 (1948)................................................................................. 7

*Schaefer Fan Co. v. J & D Mfg.,*
　　265 F.3d 1282 (Fed. Cir. 2001)................................................................... 16

Page(s)

*SEC v. First Fin. Group,*
    659 F.2d 660 (5th Cir. 1981) ............................................................... 6

*Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik*
    *Aktiengesellschaft,*
    903 F.2d 1568 (Fed. Cir. 1990) ........................................................... 12

*TiVo Inc. v. EchoStar Commc'ns Corp.,*
    516 F.3d 1290, 1310 (Fed. Cir. 2008) .................................................. 4

*TiVo v. EchoStar Comm. Corp.,*
    2007 WL 294246, No. 1:05-cv-2799-WSD, *1 (N.D. Ga., January 26,
    2007) ....................................................................................................... 15

*Union Tool Co. v. Wilson,*
    259 U.S. 107 (1922) ............................................................................. 15

*United States v. Dickinson,*
    465 F.2d 496 (5th Cir. 1972) ............................................................... 7

*United States v. Ryan,*
    402 U.S. 530 n.4 (1971) ................................................................ 6, 7, 8

*W. Water Mgmt., Inc. v. Brown,*
    40 F.3d 105 (5th Cir. 1994) ............................................................. 6, 8

*Walker v. City of Birmingham,*
    388 U.S. 307 (1967) ......................................................................... 6, 8

## I.     INTRODUCTION

On September 8, 2006, this Court issued a permanent injunction to put an end to EchoStar's infringement of TiVo's patent and to the irreparable harm that it was causing to TiVo.  The injunction's key provision was simple: "disable the DVR functionality" in all of EchoStar's DP-501, DP-508, DP-510, DP-522, DP-625, DP-721, DP-921 and DP-942 DVR receivers that had been placed with subscribers.  Yet EchoStar has not disabled the functionality in a single DVR.  Instead, EchoStar has declared itself exempt from this Court's Order, issuing press releases and notices saying that EchoStar does not have to disable any of its DVRs.  Today, nearly two years after the injunction issued, and nearly six months after the Federal Circuit affirmed, EchoStar's infringement continues to bring profit to EchoStar, while it continues to cause irreparable harm to TiVo.

Before the Court last month, EchoStar took the position that it need not comply with the *terms* of the injunction – to disable the DVR functionality – because it complied with the *spirit* of the injunction by deploying modified software that, it contends, makes the DVRs no longer infringing.[1]  However, the Court's wording wisely anticipated and tried to prevent EchoStar's current mischief by enjoining the DVR functionality in all the units covered by the infringement verdict, not giving EchoStar the ability to re-classify, on its own, the identified units as non-infringing simply because some of the software had been changed.  EchoStar had proposed language for the injunction that would have given it that ability (enjoining only "the provision of *infringing* DVR software") and the Court rejected it.

Two years ago when the injunction issued, EchoStar took a very different position on what the injunction allowed and prohibited.  When the injunction issued, EchoStar immediately requested a stay, first from this Court and then from the Federal Circuit, which granted it.  In seeking the stay, EchoStar represented that "if the injunction is not stayed, it will prevent EchoStar from providing DVR service."  Yet EchoStar already had developed the supposedly

---

[1] The injunction did not define "DVR functionality" in terms of software.  Instead, it provided as follows: "disable the DVR functionality (*i.e.*, disable all storage to and playback from a hard disk drive)."

TIVO'S MOTION FOR ECHOSTAR TO BE HELD IN CONTEMPT FOR VIOLATION OF THIS COURT'S PERMANENT INJUNCTION

non-infringing software that it now contends gives it an easy out from the injunction; in fact, it had already sought and obtained formal opinions from patent counsel regarding the software. If EchoStar is correct that by substituting this software for the old it would be in compliance with the injunction, then EchoStar never needed a stay of the injunction. Yet EchoStar requested, in the most urgent terms, a stay which it eventually received.

EchoStar never raised any challenge to the injunction or any of its terms after receiving a stay and never argued, as it does now, that the injunction could not apply to DVRs if EchoStar modified the software. EchoStar's interpretation of the injunction today is at odds with EchoStar's representations to this Court and to the Federal Circuit that it required a stay because the injunction required disablement of millions of units in the field. Having relied on the plain meaning of the injunction to obtain a stay, EchoStar should be held to the same position today, *i.e.*, that the terms (and the spirit) of the injunction require disablement of the identified units.

Accordingly, TiVo hereby moves for an Order that EchoStar be held in contempt of court and that it be ordered to comply immediately with the Order "to disable the DVR functionality," finally allowing the injunctive relief intended to protect TiVo to take effect.

## II.   STATEMENT OF FACTS

On September 8, 2006, as a result of a jury verdict, this Court entered its Final Judgment and Permanent Injunction. The Permanent Injunction required EchoStar to do, among other things, the following:

> (a) cease "making, using, offering to sell, selling, or importing into the United States," the infringing models of EchoStar DVR receivers (DP-501, DP-508, DP-510, DP-522, DP-625, DP-721, DP-921 and DP-942, the "Infringing Products") "and all other products that are only colorably different therefrom in the context of the Infringed Claims"; and

> (b) "disable the DVR functionality (i.e., disable all storage to and playback from a hard disk drive of television data) in all but 192,708 units of the Infringing Products that have been placed with an end user or subscriber. The DVR functionality . . . shall not be enabled in any new placements of the Infringing Products."

Docket No. 806, Amended Final Judgment and Permanent Injunction, at 2 (Exhibit A to Declaration of Alexander Giza ("Giza Decl."), filed concurrently).[2]

---

[2] The injunction's exception for 192,708 units represents the then-existing units on which the jury had awarded TiVo lost profits damages. Verdict Form, Docket No. 690. For that reason, TiVo did not seek an injunction on these units.

TIVO'S MOTION FOR ECHOSTAR TO BE HELD IN CONTEMPT FOR VIOLATION OF THIS COURT'S PERMANENT INJUNCTION

Before issuance of the injunction, the "disable the DVR functionality" language was the subject of argument. EchoStar argued against the disablement approach and proposed instead that the Court enjoin only "the provision of *infringing* DVR software . . . upon activation." Docket No. 737, EchoStar's (1) Opposition to TiVo's Motion for Entry of Judgment and (2) Cross-Motion to Stay any Injunction Pending Appeal, at 17 (Giza Decl., Ex. B). TiVo warned that such an approach would be "an invitation for EchoStar to engage in mischief. Such an injunction would only result in EchoStar providing what it deemed as 'non-infringing' DVR software to its already-found-to-be-infringing DVRs, creating the opportunity for interminable disputes to determine what exactly is 'infringing DVR software.'" Docket No. 747, TiVo's (1) Reply Re Motion for Entry of Judgment and Permanent Injunction and (2) Opposition to EchoStar's Cross-Motion to Stay Injunction, at 11. The Court rejected EchoStar's formulation, which would have permitted EchoStar to download a software change to its DVRs and then continue to provide the DVR functionality unless and until the software with that change was deemed to infringe, the same position it takes now. Instead, the Court required action from EchoStar that was simple and unambiguous: disablement of the DVR functionality in all the identified units.

Long before the injunction issued, EchoStar was already modifying its software. Prior to the Court's entry of the injunction on September 8, 2006, EchoStar was so far along with the development of the modified software that EchoStar already had obtained formal written opinions of counsel (dated August 24 and September 1, 2006) regarding the software that EchoStar now contends does not infringe.[3] Thus, EchoStar knew about the modified software, but did not inform this Court or the Federal Circuit of its argument that the modified software supposedly gave EchoStar an easy out from the injunction. Instead, EchoStar relied on the plain meaning of the injunction and represented that "if the injunction is not stayed, it will prevent EchoStar from providing DVR service," EchoStar's Reply Brief in Support of its Emergency Motion to Stay the District Court's Injunction, at 9 (Giza Decl., Ex. C), and that, even if

---

[3] EchoStar provided these written opinions to TiVo on April 18, 2008, to support its position that the DVRs need not be disabled based on the modified software.

TIVO'S MOTION FOR ECHOSTAR TO BE HELD IN CONTEMPT FOR VIOLATION OF THIS COURT'S PERMANENT INJUNCTION

EchoStar lost only half of its DVR customers, the losses would be $90 million per month to EchoStar. EchoStar's Emergency Motion to Stay the District Court's Injunction, at 18 (Giza Decl., Ex. D). In reliance on EchoStar's representations, the Federal Circuit stayed the injunction for the duration of the appeal, specifically noting that "the harm factors militate in its favor." Order, Oct. 3, 2006, at 2 (Giza Decl., Ex. E). The stay allowed EchoStar's infringement to continue, despite the acknowledged harm to TiVo, based on EchoStar's position regarding the injunction's language.

On appeal, EchoStar raised numerous issues but did not challenge the injunction or any of its terms. On January 31, 2008, the Federal Circuit affirmed the Final Judgment and Permanent Injunction.[4] *TiVo Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290 (Fed. Cir. 2008). The Federal Circuit stated that the stay pending appeal would dissolve when the appeal became final. *Id.* at 1312.

That same day (January 31), in response to the Federal Circuit's decision, EchoStar issued a press release announcing that it would not be disabling any of its DVR units, despite the plain language of the injunction: "The decision . . . will have no effect on our current or future customers because EchoStar's engineers have developed and deployed 'next-generation' DVR software to our customers' DVRs." Press Release, DISH Network Corp., DISH Network Statement in Response to Federal Circuit Ruling in Tivo Inc. v. EchoStar Communications Corp. (Jan. 31, 2008) ("DISH Network Press Release") (Giza Decl., Ex. F). EchoStar's position was directly at odds with its position two years earlier, when it was requesting that the injunction be stayed.

EchoStar then requested rehearing of the Federal Circuit's decision by both the panel and the Circuit *en banc* but yet again did not raise any challenge with respect to the injunction, nor did it ask for modification based on the revised software announced in EchoStar's press release. The Federal Circuit denied rehearing on April 11, 2008.

---

[4] In addition, on November 28, 2007, in connection with the reexamination proceedings initiated by EchoStar, the United States Patent and Trademark Office confirmed the validity of all of the claims of the Barton Patent.

The mandate of the Federal Circuit issued April 18, 2008. On that date, pursuant to the January 31, 2008 Order, the stay dissolved and the Permanent Injunction took effect, unchallenged and unchanged. EchoStar has acknowledged that the appeal became final and the stay of the injunction dissolved on April 18, 2008. Docket No. 826, May 23, 2008 Letter from McElhinny to Judge Folsom ("McElhinny Letter"), at 2 (Giza Decl., Ex. G).

Again EchoStar announced, this time in notices to distributors, that it had "taken steps to modify [its] DVR products" such that "no further action [was] necessary" to comply with the Permanent Injunction. EchoStar's April 18, 2008 Notice of Amended Final Judgment and Permanent Injunction (Giza Decl., Ex. H). Despite its announcements to the public, EchoStar never asked this Court for a ruling that it had complied with the injunction or to modify the injunction and approve the substitution of modified software.

On May 30, 2008, the Court held a status conference regarding the injunction issues. Again EchoStar took a position directly at odds with its position two years earlier and argued that the injunction did not required disablement of any units with the modified software. The Court then set a briefing and hearing schedule.

Less than an hour after the status conference concluded, EchoStar filed a new action, seeking a declaration from a different judge in another federal court, the District of Delaware, that EchoStar's DVRs with modified software do not infringe TiVo's Patent. Complaint, *DISH Network Corp. v. TiVo Inc.*, Case No. 08-327-JJF (Giza Decl., Ex. I).

In sum, it is undisputed that the injunction is in effect but that EchoStar has not disabled the DVR functionality in the products identified in the injunction: DP-501, DP-508, DP-510, DP-522, DP-625, DP-721, DP-921 and DP-942. It is also undisputed that EchoStar has no present intention to do so. Consequently, a contempt proceeding is necessary and appropriate.

## III.    EchoStar Should Be Held in Contempt For Deliberately Ignoring The Terms Of This Court's Permanent Injunction.

### A.    Applicable Law

"In a civil contempt proceeding, the party seeking an order of contempt need only establish (1) that a court order was in effect, and (2) that the order required certain conduct by

the respondent, and (3) that the respondent failed to comply with the court's order." *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995) (citing *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)). "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *SEC v. First Fin. Group*, 659 F.2d 660, 669 (5th Cir. 1981).

Because civil contempt proceedings are not unique to patent law, regional circuit law applies. *Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1313 (Fed. Cir. 2002). In the Fifth Circuit, a district court's decision to hold a party in contempt is reviewed for abuse of discretion, and the underlying factual findings are reviewed for clear error. *Martin*, 959 F.2d at 48.

Having passed up the opportunity to challenge the validity, scope, or specific terms of the injunction on appeal, EchoStar cannot do so now in the guise of arguing that the spirit of the injunction required something different from its literal terms. *United States v. Ryan*, 402 U.S. 530, 532 n.4 (1971) (citing *Walker v. City of Birmingham*, 388 U.S. 307 (1967)); *W. Water Mgmt., Inc. v. Brown*, 40 F.3d 105, 108 (5th Cir. 1994) (prohibiting defendants from arguing in a contempt proceeding that injunction was overbroad; "collateral attack on an injunction during contempt proceedings is prohibited if earlier review of the injunction was available" (citing *Ryan*, 42 U.S. at 532 n.4)). As the Supreme Court has made clear, "[a] 'contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy.'" *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 441 n.21 (1986) (quoting *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948)).

This rule against collateral attack on injunctions during contempt proceedings has longstanding roots in American jurisprudence, and stems from the unique role of judges as the final adjudicators of legal disputes. *United States v. Dickinson*, 465 F.2d 496, 510 (5th Cir. 1972). The judiciary "is vested with the duty and the power to interpret and apply statutory and constitutional law," and such "[d]eterminations take the form of orders. . . . [R]efusal to obey an order of the court without testing its validity through established processes requires further action

by the judiciary, and therefore affects the judiciary's ability to discharge its duties and responsibilities." *Id.* Thus, "'the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration whose judgments and decrees are only advisory.'" *Id.* (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911)). "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." *Gompers*, 221 U.S. at 450. The Supreme Court has affirmed contempt convictions even where the underlying injunction would "unquestionably be subject to substantial constitutional questions." *Walker*, 388 U.S. at 317. As the *Walker* court explained, "respect for judicial process is a small price to pay for the civilizing hand of law." *Id.* at 321. To maintain the inviolability of court orders, "collateral attack on an injunction during contempt proceedings is prohibited if earlier review of the injunction was available." *W. Water Mgmt*, 40 F.3d at 108 (citing *Ryan*, 402 U.S. at 532 n.4). Thus, as a matter of law, EchoStar is prohibited from challenging the validity of the injunction in this contempt proceeding.

B.     **EchoStar's Failure to Abide by the Plain Language of the Injunction Constitutes Contempt.**

In persuading the Federal Circuit to enter a stay, EchoStar represented that if the "injunction were not stayed, EchoStar would be required to disable the DVR functionality of DVRs installed in over three million households." EchoStar's Emergency Motion to Stay the District Court's Injunction, at 20 (Giza Decl., Ex. D). EchoStar stated that if it could "neither continue providing DVR service to its existing customers nor offer DVRs to its new customers, [it] face[d] a high risk of losing a significant portion of its existing and potential subscribers" and that "if the injunction were to cause just half of EchoStar's current customers with DVRs to leave EchoStar for another provider, EchoStar's revenues would fall by nearly $90 million *per month*." *Id.* at 18 (citing Martin Decl. ¶ 8) (emphasis in original). Despite the seemingly dire financial consequences of the injunction, EchoStar made the decision to raise numerous other

issues for review on appeal to the Federal Circuit, but not to raise any aspect of this Court's Permanent Injunction.

It is beyond debate that EchoStar was and is capable of complying with the injunction. When the injunction was being argued before this Court in 2006, EchoStar did "not dispute that, with software updates transmitted directly to the infringing products, the DVR capabilities of the infringing products can be disabled." Docket No. 773, Order, Aug. 17, 2006, at 11. The Court noted that "this process, though cumbersome, is not on balance a weighty hardship for Defendants." *Id.* EchoStar has used this process, but not to disable any DVR functionality, as the injunction requires. Instead, EchoStar has been using this process for over a year to secretly deliver allegedly modified DVR software to its products.[5] McElhinny Letter, at 3-4 (Giza Decl., Ex. G); May 8, 2008 Letter from Patiño to Goldberg (Giza Decl., Ex. J). These actions leave no doubt that EchoStar was capable of complying with the Permanent Injunction using the procedure contemplated by the Court, but it chose not to do so.

Furthermore, it is beyond dispute that the issue posed by EchoStar now – whether its modified software complies with the spirit of the injunction – could have been raised and resolved long ago. According to EchoStar, it began working on modifying its software immediately after the jury verdict in April 2006. By the time this Court entered final judgment on September 8, 2006, EchoStar had modified the software and already obtained formal written opinion letters assessing whether the modified software infringed TiVo's Patent. Yet EchoStar kept the modifications secret. It did not reveal the modification efforts while they were ongoing, either during the briefing or arguments on the injunction, nor did it seek any approval of the modifications or ask for any ruling from this Court afterwards with respect to changing the

---

[5] TiVo's preliminary review of EchoStar's allegedly modified software suggests that it is not colorably different from EchoStar's adjudged infringing software and that it continues to infringe the Barton Patent. Pursuant to the May 30 status conference, TiVo plans to address this issue separately, if necessary, after conducting a limited amount of discovery. Transcript, May 30, 2008, at 16-18. TiVo also plans to address separately, if necessary, EchoStar's new DVR products with model numbers that were not specified in the Permanent Injunction. TiVo believes these products are not colorably different from the Infringing Products and continue to infringe the Barton Patent, and therefore may constitute another ground for which EchoStar should be held in contempt.

software.  Instead, EchoStar started downloading the modified software to its subscribers at the end of 2006 and continued the process throughout 2007, reaching millions of households.  But again, EchoStar kept its actions secret.  EchoStar also did not disclose its efforts to the appellate court nor did it seek review of the injunction to determine whether the DVRs with modified software would still need to be disabled.  On January 31, 2008, when the Federal Circuit issued its decision, EchoStar simply took the law into its own hands.  EchoStar publicly announced that it had modified its software and that it would not be disabling any DVRs, as if it were up to EchoStar to determine that it no longer needed to comply with the terms of this Court's Order.  EchoStar did not notify this Court of its actions until May 23, 2008, more than two years after it says it began the process.  McElhinny Letter, at 3 (Giza Decl., Ex. G).  Even then, EchoStar did so only after TiVo brought the issue to the Court's attention, not because EchoStar sought any ruling from this Court.

EchoStar's lengthy and secretive strategy contradicts its position today that it believed it was complying with the spirit of the injunction.  EchoStar's engineers, we are told now, were working to modify the DVR software at the same time that EchoStar's counsel asked that the Court enjoin only "the provision of *infringing* DVR software."  Docket No. 737, EchoStar's (1) Opposition to TiVo's Motion for Entry of Judgment and (2) Cross-Motion to Stay any Injunction Pending Appeal, at 17 (emphasis added) (Giza Decl., Ex. B).  But the Court adopted the straightforward "disable the DVR functionality" that appears in the Permanent Injunction, defining "DVR functionality" as "*all* storage to and playback from a hard disk drive of television data" and defining "Infringing Products" as specific model numbers of DVR receivers.  Amended Final Judgment and Permanent Injunction, at 2 (emphasis added) (Giza Decl., Ex. A).  EchoStar then immediately sought a stay of the injunction based on the serious financial consequences to its business of disabling the DVR functionality.  If EchoStar is correct that, by substituting the "modified" software for the old software, it would not need to disable the DVR functionality to comply with the injunction, then EchoStar never needed a stay of the injunction.  Yet EchoStar never disclosed its "modified" software position to the Court nor did it ask this Court for approval of its position.  Why?  *Because EchoStar knew that its position had already*

*been rejected*.  EchoStar therefore proceeded in secret, gambling that the Federal Circuit would grant it a stay and might ultimately reverse the judgment.  Or if the judgment were affirmed, that this Court might not enforce the injunction as written.

Now that the judgment has been affirmed and this Court has set the issue for hearing, EchoStar has filed a new action before another judge – in the District of Delaware – to determine whether the alleged modifications to its software were sufficient to render it non-infringing.  That issue is properly before *this* Court and, in fact, was discussed in this very Court minutes before EchoStar filed its complaint in Delaware.  Presumably EchoStar hopes that the pendency of the other action will put any ruling by this Court in limbo and that a final judgment in Delaware will take years.  In the meantime, EchoStar's profitability through infringement can continue unchecked.

Such tactics parallel EchoStar's strategy before this Court.  EchoStar persuaded the Federal Circuit to stay the injunction, arguing that the plain language of the injunction would require EchoStar to cease providing DVR service, causing its customers to leave in droves and severely harming its business.  Now that the Federal Circuit has lifted the stay, EchoStar reverses course and argues that the injunction does not require it to change its conduct *at all*, and brings to light that it modified its software.  EchoStar's strategy is clear: stay one step ahead of the law, and the courts will never catch up.

EchoStar spent two years clandestinely preparing and delivering modified software to its units before informing this Court of its behavior and never informing TiVo or the Federal Circuit of the conduct.  McElhinny Letter, at 3 (Giza Decl., Ex. G).  As discussed above, when the Federal Circuit affirmed the judgment, EchoStar issued a press release announcing, without seeking any guidance from this Court, that it could ignore the disablement requirement of the injunction.  DISH Network Press Release (Giza Decl., Ex. F) ("The decision . . . will have no effect on our current or future customers because EchoStar's engineers have developed and deployed 'next-generation' DVR software to our customers' DVRs.").  On the day the Federal Circuit's mandate issued, EchoStar again announced, without seeking any guidance from this Court, that it had "taken steps to modify [its] DVR products" such that "no further action [was]

- 10 -

necessary" to comply with the Permanent Injunction. EchoStar's April 18, 2008 Notice of Amended Final Judgment and Permanent Injunction (Giza Decl., Ex. H). The only issue on which EchoStar may seek "clarification" from the Court is the comparatively minor issue of the 192,708 unit exception to the injunction. Yet for the millions of DVRs that the jury found were infringing, EchoStar has never sought any clarification; it simply ignored the requirement that it "disable all storage to and playback from a hard disk drive of television data" in those products. Amended Final Judgment and Permanent Injunction, at 2 (Giza Decl., Ex. A).

EchoStar's argument that the Court can no longer exert its authority over the DVRs once EchoStar has modified their software is not only an improper collateral attack on the injunction (as discussed above), it is wrong. The Federal Circuit has approved the district courts' authority to rule upon and to enjoin so-called "design arounds" in injunctions in patent infringement cases. For example, in *Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.*, the district court issued an order enjoining the defendant "from making, using, and/or selling any positive displacement flowmeter" and prohibiting the defendant from engaging in commercial activities for any allegedly redesigned flowmeter product without obtaining the court's permission in advance. 32 U.S.P.Q.2d 1747, 1757 (S.D. Tex. July 12, 1994), *aff'd in part and rev'd in part on other grounds*, 154 F.3d 1345, 1356 (Fed. Cir. 1998). The Federal Circuit affirmed this portion of the order, finding that "the district court reasonably concluded that such measures were necessary in this case to compel compliance with the court's orders." 154 F.3d at 1356. The Federal Circuit approved a similar provision, prohibiting the defendant from selling any allegedly redesigned device without obtaining the court's permission in advance, in *Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 903 F.2d 1568, 1577 (Fed. Cir. 1990). In each of these cases, the defendants engaged in precisely the same tactic that EchoStar has here, claiming to have redesigned a product to avoid infringement and, in each case, the court determined that it had authority over the allegedly modified product. *Spindelfabrik*, 903 F.2d at 1571; *Additive Controls*, 32 U.S.P.Q.2d at 1755, 1757.

Here, EchoStar knew that it was modifying its software when the injunction issue was being briefed and argued before this Court. EchoStar could have and should have requested a

"pre-clearance" provision like the ones above.  EchoStar made the decision to go ahead in secrecy without any Court approval instead.  But that did not make EchoStar's modified products automatically exempt from the Court's injunction.  To the contrary, under the language of the injunction, they remained subject to the disablement requirement.  To exempt them would require a decision by this Court, not by EchoStar.  As EchoStar's behavior confirms, the Court's decision to issue a simple and unambiguous order, "disable the DVR functionality (i.e., disable all storage to and playback from a hard disk drive of television data) in [DP-501, DP-508, DP-510, DP-522, DP-625, DP-721, DP-921 and DP-942]" was a wise one.

EchoStar's decision to be less than candid with this Court and with the Federal Circuit – by seeking a stay of the injunction without disclosing its efforts to modify the software and then, if necessary in the future, using the software modifications as an argument for disregarding the injunction's disablement provision – was made deliberately.  While EchoStar may now be arguing that the spirit of the injunction allows for modified software, its previous positions with this Court and with the Federal Circuit coupled with its conduct show that it was attempting to circumvent the injunction, not comply with it.  Such conduct constitutes contempt of court.

### C.    EchoStar Has Chosen Not To Comply With Court Orders Before.

EchoStar's claim that it was complying with the spirit of the injunction presumes that EchoStar intended to comply this Court's Order.  But in other cases, EchoStar has chosen not to comply with court orders, further suggesting that it is doing so here, also.

For example, in *CBS Broadcasting, Inc. v. EchoStar Communications Corp.*, which concerned EchoStar's obligations under the Satellite Home Viewer Act, "[i]n an effort to dissuade [the] Court from issuing a preliminary injunction, EchoStar CEO Charles Ergen made a formal pledge, under penalty of perjury" that EchoStar would terminate the delivery of some stations to certain subscribers.  276 F. Supp. 2d 1237, 1244 (S.D. Fla. 2003), *aff'd in part and rev'd in part on other grounds*, 450 F.3d 505 (11th Cir. 2006).  If EchoStar kept its pledge, "it would have terminated one or more distant network stations to more then 258,000 subscribers." *Id*. at 1245.  But "[i]t appear[ed] that EchoStar executives, including Mr. Ergen . . . , when confronted with the prospect of cutting off network programming to hundreds of thousands of

subscribers, elected instead to break Mr. Ergen's promise to the Court." *Id*. at 1246.  On appeal, the Eleventh Circuit "found no indication that EchoStar was ever interested in complying with the Act."  450 F.3d at 526.  Indeed, "EchoStar ha[d] disregarded the limitations of its statutory license and sought to avoid its obligations under the Act at every turn."  *Id*.  After reaching "the unavoidable conclusion that EchoStar engaged in a 'pattern or practice' of [statutory] violations," and that EchoStar had violated the Act "in every way imaginable," the Eleventh Circuit remanded to the district court for entry of "a nationwide permanent injunction."  *Id*. at 527.  In *CBS*, EchoStar chose to disregard legal obligations in order to maintain 258,000 subscribers.  Here the number of subscribers involved is in the millions, significantly increasing EchoStar's motive for ignoring the Court's injunction.

Decisions by other courts demonstrate that EchoStar's lack of respect for the law and the courts was not limited to the *CBS* case.  For example:

- *Broccoli v. EchoStar Communications Corp*., 229 F.R.D. 506, 512 (D. Md. Aug. 4, 2005) (awarding attorney's fees under Rule 37: "Even more than before trial, it is now 'clear beyond reasonable dispute that [EchoStar] ha[d] been guilty of gross spoliation of evidence.'  Echostar clearly acted in bad faith. . . .  These bad faith actions prejudiced Broccoli in his attempts to litigate his claims and measurably increased the costs for him to do so.");

- *CBS Broadcasting Inc. v. Northwestern Ins. Co.*, Misc. Action No. 02-400, 02-402 (W.D. Pa. Apr. 17, 2003), *rev'd on procedural grounds*, 125 Fed. Appx. 455 (3d Cir. 2005), Memorandum Order (sanctioning EchoStar for bringing harassing motion to compel in violation of injunction and prior orders of the court: "Having reviewed the parties' briefs in this matter, we, too, are hard pressed to attribute good motives to EchoStar's conduct.");

- *EchoStar Satellite Corp. vs. Young Broadcasting Inc.*, 2001 WL 876964, 16 F.C.C. Rec. 15,070, ¶ 12 (F.C.C. Aug. 6, 2001) ("EchoStar failed in its duty of candor ....  We admonish EchoStar for this abuse of process and caution EchoStar to take greater care.")

Similarly, in connection with a subpoena issued in this case in Georgia, EchoStar filed a motion to quash, and the Court there chastised EchoStar for being evasive in responding to its order to show compliance with an earlier discovery order: "Knearl and EchoStar represent that they have complied fully with the June 8, 2006 order, but do so with vague, equivocal, and qualified explanations.  The responsive brief to TiVo's motion suggests a legal shell game, which Knearl and EchoStar may be playing without a pea." *TiVo v. EchoStar Comm. Corp.,* 2007 WL 294246, No. 1:05-cv-2799-WSD, at *1 (N.D. Ga. Jan. 26, 2007).

- 13 -

EchoStar's argument that it should not be held in contempt of court because of a good faith belief that it had designed around TiVo's patent should be considered in light of EchoStar's prior instances of disregard for court orders and its lack of candor with the Court in this case.

## IV.     TiVo Reserves Its Claim For Damages For EchoStar's Contemptuous Conduct

A district court enjoys broad discretion in fashioning an appropriate remedy for a violation of its order. *E.g., Dow Chem. Co.*, 434 F.2d at 1214-15. Of course, such discretion is not unfettered, and, where a violation is found, a court must provide an appropriate remedy. *Union Tool Co. v. Wilson*, 259 U.S. 107, 112-14 (1922) (affirming appellate court's decision that district court erred by failing to compensate contempt plaintiff for all of defendant's violations of injunction against patent infringement). The remedy for contempt can include the injury suffered by one party as a result of the other party's noncompliance with the injunction, disgorgement of profits, attorneys fees and costs.

"[T]he proper aim of judicial sanctions for civil contempt is 'full remedial relief.'" *Fla. Steel Corp. v. NLRB*, 648 F.2d 233, 239 (5th Cir. 1981) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). In addition to compensating an injured party for losses sustained as a result of noncompliance, civil contempt remedies may also include coercive measures to enforce compliance with a court order. *McComb*, 336 U.S. at 191. In patent cases, courts are not bound by the Patent Act in calculating damages for contempt, but such principles can of course provide useful guidance. *Dow Chem. Co. v. Chem. Cleaning, Inc.*, 434 F.2d 1212, 1214-15 (5th Cir. 1970) ("In dealing with a civil contempt proceeding the district court was not bound by the provisions of [the Patent Act]. Rather it was free to exercise the inherent discretion possessed by a court to correct willful violations of solemnly passed orders."). Awarding multiple damages for contempt of an injunction is often appropriate. *E.g., Additive Controls*, 32 U.S.P.Q.2d at 1757. Disgorgement of profits may be required to achieve full remedial relief. *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 457 (1932) ("[I]n a proceeding for civil contempt for disobedience to an injunction granted in an infringement suit, the profits derived from the violation of the injunction are recoverable."); *Schaefer Fan Co. v. J & D Mfg.*, 265 F.3d 1282, 1290 (Fed. Cir. 2001) (affirming district court's award of total profits for contempt of settlement

- 14 -

agreement in infringement action).  Costs and attorney's fees are routinely awarded to a party injured as a result of contempt.  *E.g., Dow Chem. Co.*, 434 F.2d at 1215 ("There are contempt cases in abundant number holding that a court has discretion to award reasonably attorney's fees and other expenses necessary to make an innocent party whole.").

TiVo therefore reserves its right to request appropriate financial remedies after a finding of contempt by this Court.

## V.    Conclusion

In 2006, EchoStar acknowledged that the Permanent Injunction requires the specified DVR models to be disabled.  EchoStar used the plain meaning of the injunction to support its request for a stay of the injunction, and it received the stay based on its representations as to the effect of the injunction.  On appeal, EchoStar never asked for review of the injunction and never raised the argument that it does now.  Having lost on appeal, EchoStar now seeks to change its position as to what the injunction requires.

TiVo respectfully requests that the Court issue an Order holding EchoStar in contempt of the Permanent Injunction and requiring EchoStar to comply by disabling the DVR functionality within seven calendar days in the DVR receivers specified in the injunction (i.e., DP-501, DP-508, DP-510, DP-522, DP-625, DP-721, DP-921 and DP-942).

- 15 -

Dated:  June 13, 2008                    Respectfully submitted,


                                         By:   /s/ Sam Baxter

                                         Sam Baxter, Lead Attorney
                                         TX State Bar No. 01938000
                                         McKOOL SMITH, P.C.
                                         104 East Houston Street, Suite 300
                                         Marshall, Texas 75670
                                         Telephone: (903) 923-9000
                                         Fax: (903) 923-9099
                                         sbaxter@mckoolsmith.com

                                         IRELL & MANELLA LLP
                                         Morgan Chu (Pro Hac Vice)
                                         Christine Byrd(Pro Hac Vice)
                                         Perry Goldberg (Pro Hac Vice)
                                         Andrei Iancu (Pro Hac Vice)
                                         1800 Avenue of the Stars, Suite 900
                                         Los Angeles, California 90067-4276
                                         Telephone:      (310) 277-1010
                                         Facsimile:      (310) 203-7199

                                         Attorneys for Plaintiff
                                         and Counterdefendant TiVo Inc.

TIVO'S MOTION FOR ECHOSTAR TO BE HELD IN CONTEMPT FOR VIOLATION OF THIS COURT'S
PERMANENT INJUNCTION

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document was served on all parties by electronic service on the 13th day of June 2008.

By:   /s/ Sam Baxter
         Sam Baxter

TIVO'S MOTION FOR ECHOSTAR TO BE HELD IN CONTEMPT FOR VIOLATION OF THIS COURT'S
PERMANENT INJUNCTION